**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>     **Plaintiff,**<br><br>  -against-<br><br>**MMOBUOSI ODOGWU BANYE (a/k/a DOZY MMOBUOSI), TINGO GROUP, INC., AGRI-FINTECH HOLDINGS, INC. (f/k/a TINGO INC.), and TINGO INTERNATIONAL HOLDINGS, INC.,**<br><br>     **Defendants.** | 23 Civ. 10928 (  ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
EMERGENCY APPLICATION FOR AN ORDER TO SHOW CAUSE,
TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION
INCLUDING AN ASSET FREEZE AND GRANTING OTHER RELIEF**

David Zetlin-Jones
Michael S. DiBattista
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Ste. 20-100
New York, NY 10004
(212) 336-0978 (Zetlin-Jones)
zetlinjonesj@sec.gov

*Attorneys for Plaintiff*

December 18, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 5

    I.    TINGO MOBILE AND TIH ..................................................................................... 5

           A.  Mmobuosi Knowingly or Recklessly Causes the Manufacture and Dissemination of False Financial Statements for Tingo Mobile ........................................ 6

           B.  Mmobuosi Knowingly or Recklessly Causes the Manufacture and Dissemination of False Financial Statements for TIH ........................................................ 8

           C.  Mmobuosi Obstructs Oversight Over Tingo Mobile's and TIH's Financial Reporting and Operations ........................................................................ 9

           D.  Mmobuosi Pursues a Direct Listing for TIH .............................................. 11

    II.    MMOBUOSI USES TINGO MOBILE'S FALSIFIED STATEMENTS TO FRAUDULENTLY INDUCE THE SALE OF TINGO MOBILE TO AGRI-FINTECH AND THEN TO TINGO GROUP .............................................................. 11

    III.    MMOBUOSI KNOWINGLY OR RECKLESSLY CAUSES THE FALSIFICATION OF AGRI-FINTECH'S AND TINGO GROUP'S BOOKS AND RECORDS ........................................................................................................ 13

    IV.    MMOBUOSI COMPOUNDS THE FRAUD BY INVENTING TINGO FOODS .......................................................................................................................... 17

    V.    AGRI-FINTECH'S AND TINGO GROUP'S MATERIALLY FALSE PUBLIC STATEMENTS .......................................................................................... 18

    VI.    DEFENDANTS PERSIST IN THEIR FRAUD EVEN AFTER HIDENBURG'S PARTIAL REVELATION OF IT AND THE COMMISSION'S IMPOSITION OF A TRADING SUSPENSION ..................... 19

    VII.    MMOBUOSI IS PROFITING FROM HIS FRAUD ......................................... 22

           A.  Mmobuosi's Illegal Insider Trading ......................................................... 23

           B.  Mmobuosi's Misappropriation of Tingo Group's Assets ........................ 24

**ARGUMENT** ...................................................................................................................25

**I.   DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND
      PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE
      FEDERAL SECURITIES LAWS** ...........................................................................25

    A.   The Commission Has Made a Substantial Showing that Defendants Violated the
        Antifraud Provisions of the Securities Act and Exchange Act ...............................26

        1.   The Commission Has Made a Substantial Showing That Defendants Made
            Material Misrepresentations ........................................................................26

        2.   The Commission Has Made a Substantial Showing that Defendants'
            Material Misstatements Were In Connection with the Purchase and Sale of
            Securities ....................................................................................................28

        3.   The Commission Has Made a Substantial Showing that Defendants Acted
            with the Requisite Scienter .........................................................................29

        4.   The Commission Has Made a Substantial Showing That Defendants
            Engaged in a Fraudulent Scheme ................................................................33

    B.   The Commission Has Made a Substantial Showing that Mmobuosi Aided and
        Abetted the Corporate Defendants' Violations of the Antifraud Provisions of the
        Securities Act and Exchange Act...........................................................................35

    C.   The Commission Has Made a Substantial Showing That Mmobuosi Engaged in
        Illegal Insider Trading ..........................................................................................36

    D.   The Commission Has Made a Substantial Showing that Mmobuosi Failed to
        Timely File a Form 4 with the Commission ..........................................................36

    E.   The Commission Has Made a Substantial Showing that Agri-Fintech and Tingo
        Group Filed, and that Mmobuosi Aided and Abetted Their Filing of, False
        Periodic Reports with the Commission..................................................................37

    F.   The Commission Has Made a Substantial Showing that Mmobuosi Falsely
        Certified Agri-Fintech's Periodic Reports .............................................................38

    G.   The Commission Has Made a Substantial Showing that Agri-Fintech and Tingo
        Group Violated, And Mmobuosi Aided and Abetted Violations of, the Securities
        Laws' Record-Keeping and Internal Control Provisions........................................39

    H.   The Commission Has Made a Substantial Showing That Mmobuosi Directly or
        Indirectly Falsified Agri-Fintech's and Tingo Group's Books and Records and
        Circumvented These Issuers' Controls...................................................................40

I.     The Commission Has Made a Substantial Showing that Mmobuosi Deceived Agri-Fintech's and Tingo Group's Auditors...........................................................41

J.     The Commission Has Made a Substantial Showing That Mmobuosi Has Failed to Comply with Section 304 of the Sarbanes Oxley Act of 2002 ..........................41

K.    The Commission Has Made a Substantial Showing of Mmobuosi's Liability as a Control Person ...........................................................................................................42

L.    Defendants are Likely to Continue Their Illegal Conduct......................................43

**II.    THE COURT SHOULD GRANT ADDITIONAL EQUITABLE RELIEF TO PROTECT INVESTORS**...............................................................................................44

A.    The Court Should Enter an Order Freezing Mmobuosi's Assets ..........................44

B.    The Court Should Order Mmobuosi to Repatriate the Proceeds of the Fraud ...45

C.    The Court Should Enter an Order Enjoining the Corporate Defendants from Transferring Money or Property or Issuing New Shares to Mmobuosi...............46

D.    The Court Should Enter an Order Restraining Defendants from Selling Their Holdings of Agri-Fintech and/or Tingo Group Stock ............................................47

E.    The Court Should Order Defendants to Produce a Verified Accounting ............47

F.    The Court Should Enter an Order Prohibiting the Destruction of Documents. ...............................................................................................……………48

**III.   THE COURT SHOULD ENTER AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED**.............................48

**CONCLUSION**.................................................................................................................49

# TABLE OF AUTHORITIES

*Aaron v. SEC,* 446 U.S. 680 (1980) ..................................................................................................26

*In re Alstom SA*, 454 F. Supp. 2d 187 (S.D.N.Y. 2006)...................................................................43

*In re Am. Intern. Grp. Inc. 2008 Sec. Litig.*, 741 F. Supp. 511 (S.D.N.Y. 2010) ............................43

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................................29

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) ......................................................................42

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ..........................................................................29

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) .............................................................29

*Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) ...........................................................................33

*In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998)...........................................27

*In re Marsh & McLennan Companies, Inc Sec. Litig.*, 501 F. Supp. 452 (S.D.N.Y. 2006)...............32, 33

*McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105 (S.D.N.Y. 2013) ...............31

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) .......................................28

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................................................30

*Patel v. L-3 Commc'ns Holdings Inc.*, 14-cv-6038 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ................................................................................................................................................33

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (1999) .............................................................28

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978) ...................................................29

*Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010)............................................................................28

*Salman v. United States*, 580 U.S. 39 (2016) ...................................................................................36

*SEC v. 800america.com*, No. 02 Civ. 9046(HB), 2006 WL 3422670 (Nov. 28, 2006) .....................39, 40

*SEC v. Aimsi Techs.*, Inc., 650 F. Supp. 2d 296 (S.D.N.Y. 2009).....................................................45

*SEC v. American Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2018 WL 6322145 (S.D.N.Y. Dec. 4, 2018)..................................................................................................................................28

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ...................................................................................35

iv

*SEC v. Aragon Cap. Advisors*, L.L.C., No. 1:07- cv-00919, 2011 WL 3278642 (S.D.N.Y. July 26, 2011) ....................................................................................................................................................45

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000) ...............................................................45

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) .............................................................................25

*SEC v. Cole*, 12-CV-8167 RJS, 2015 WL 5737275 (S.D.N.Y. 2015) ......................................... 28, 34

*SEC v. Collector's Coffee, Inc.*, No. 19-CIV-4355 (VM), 2023 WL 6453709 (S.D.N.Y. Oct. 4, 2023) ...................................................................................................................................................30, 34

*SEC v. Collins and Aikman Corp.*, 524 F. Supp. 477 (S.D.N.Y. 2007) .......................................31

*SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) ...........40

*SEC v. DiBella*, 587 F.3d 553 (2d Cir. 2009)..................................................................................35

*SEC v. DiMaria*, 207 F. Supp.3d 343 (S.D.N.Y. 2016) .................................................................27

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ...............................................................41

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) .....................................................42

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016).............................................................................26

*SEC v. Illarramendi*, No. 3:11cv78 (JBA), 2011 WL 2457734 (D. Conn. June 16, 2011) .......45

*SEC v. Infinity Grp.*, 212 F.3d 180 (3d Cir. 2000)......................................................................44

*SEC v. Lybrand*, No. 00 Civ. 1387 (SHS), 2000 WL 913894 (S.D.N.Y. July 6, 2000) ...........48

*SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y. 2003) ..............................................................46

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998) ...............................................................29, 37, 39

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ................................................ 25, 44

*SEC v. Nostra Energy, Inc.*, 202 F. Supp. 3d 391 (2016) ............................................................26

*SEC v. Obus*, 693 F. 3d 276 (2d Cir. 2012) .................................................................................36

*SEC v. OxTadrus Cap. Sec., Inc.*, 794 F. Supp. 104 (S.D.N.Y. 1992) .......................................48

*SEC v. Res. Dev. Int'l L.L.C.*, 160 F. App'x 368 (5th Cir. Dec. 21, 2005)..................................45

*SEC v. Rio Tinto PLC*, 41 F. 4th 47 (2d Cir. 2022) .....................................................................34

*SEC v. Rosenberger*, No. 22-CV-4736 (DLC), 2023 WL 1928093 (S.D.N.Y. Feb. 10, 2023).................38

*SEC v. Sason*, 4333 F. Supp. 3d 496 (S.D.N.Y. 2020) ........................................................... 34, 43

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) ..................................................... 26, 40

*SEC v. Spongetech Delivery Sys., Inc.*, No. 10-CV-2031 (DLI) (JMA), 2011 WL 887940 (E.D.N.Y. Mar. 14, 2011) ........................................................................................................................48

*SEC v. Taronis Techs., Inc.*, 2023 WL 5625299 (M.D. Fla. Aug. 31, 2023) ...............................42

*SEC v. Texas Gulf Sulphur Co*, 401 F. 2d 833 (2d Cir. 1968).....................................................29

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)...................................................... 44, 45, 48

*SEC v. Verdiramo*, 890 F. Supp. 2d 257 (S.D.N.Y. 2011) ..........................................................37

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ....................................................... 29, 30, 34

*SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011) ....................................................................29

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ...................................................29

*Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994) .......................................................29

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) ....................................................................... 44, 47

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001)...................32

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................42

*In re Teva Sec. Litig.*, No. 3:17-CV-00558 (SRU), 2023 WL 3186407 (S.D.N.Y. May 1, 2023).............33

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976).............................................................27

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ...........................................................37

*United States v. Naftalin*, 441 U.S. 768 (1979) .........................................................................28

*United States v. O'Hagan*, 521 U.S. 642 (1997) ................................................................. 28, 36

*Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 672 F. Supp. 2d 596 (S.D.N.Y. 2009)............31

*In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003).............................................30

## Statutes and Regulations

15 U.S.C. § 77q(a)(1) ................................................................ 33-34

15 U.S.C. § 77q(a)(2) .................................................................... 28

15 U.S.C. § 77q(a)(3) ................................................................ 33-34

15 U.S.C. 78m(a) ........................................................................ 37

15 U.S.C. § 78m(b)(2)(A) ............................................................. 39

15 U.S.C. § 78m(b)(2)(B) ............................................................. 39

15 U.S.C. § 78m(b)(5) .................................................................. 40

15 U.S.C. § 78p(a) ....................................................................... 37

15 U.S.C. § 78u(d)(5) ................................................................... 44

15 U.S.C. § 80b-6(1) .................................................................... 48

15 U.S.C. § 7243(a) ..................................................................... 41

17 C.F.R. § 240.10b-5(a) .............................................................. 33

17 C.F.R. § 240.10b-5(c) .............................................................. 33

17 C.F.R. § 240.12b-2 .................................................................. 42

17 C.F.R. § 240.12b-20 ................................................................ 37

17 C.F.R. § 240.13a-1 .................................................................. 37

17 C.F.R. § 240.13a-11 ................................................................ 37

17 C.F.R. § 240.13a-13 ................................................................ 37

17 C.F.R. § 240.13b-1 .................................................................. 40

17 C.F.R. § 240.13b2-2(a) ............................................................ 41

17 C.F.R. § 240.13b2-2(b) ............................................................ 41

17 C.F.R. § 240.16a–3 .................................................................. 37

17 C.F.R. § 240.16a–3(g)(1) .......................................................... 37

**Secondary Sources**

FASB Accounting Standard Codification ("ASC") 250 ..........................................................................42

Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150, (1999)...........................................42

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law, together with the Declarations of Christopher Mele ("Mele Decl."), Peter R. Barker ("Barker Decl."), James Patrick Lynch ("Lynch Decl.") and Michael S. DiBattista ("DiBattista Decl."), as well as the Local Civil Rule 6.1(d) Declaration of David Zetlin-Jones ("Zetlin-Jones Decl."), in support of its emergency application for an order to show cause and other temporary and preliminary relief against Defendants Tingo International Holdings, Inc. ("TIH"), Agri-Fintech Holdings, Inc. ("Agri-Fintech"), Tingo Group, Inc. ("Tingo Group"), and Mmobuosi Odogwu Banye, a/k/a Dozy Mmobuosi ("Mmobuosi") (collectively "Defendants"), including a temporary restraining order: (i) freezing Mmobuosi's assets; (ii) prohibiting TIH, Agri-Fintech and Tingo Group from transferring money or property or issuing shares to Mmobuosi; (iii) enjoining Defendants from selling or otherwise disposing of their respective holding in Agri-Fintech and/or Tingo Group stock; (iv) prohibiting Defendants and their agents from destroying, altering, or concealing records and documents; and (vi) ordering Defendants to show cause why a preliminary injunction continuing the relief set forth in any temporary restraining order as well as ordering repatriation of proceeds and a sworn accounting should not be entered. For the reasons set forth below, the Court should grant the Commission's application in its entirety.

## PRELIMINARY STATEMENT

The Commission files this emergency action to halt a massive, ongoing fraud perpetrated by Defendant Mmobuosi ("Mmobuosi") through three companies he owns and controls: TIH, Agri-Fintech and Tingo Group (collectively, "Corporate Defendants"). Since at least 2019, Mmobuosi has intentionally or recklessly caused the fabrication of billions of dollars of purchases and sales of non-existent mobile handsets and food crops from fictitious suppliers and customers at two Nigerian subsidiary companies he founded and controls. The Corporate Defendants have each

1

incorporated these and other fictitious transactions into their books and records and intentionally and materially overstated their reported revenues, expenses, and assets as a result.

Mmobuosi incepted the fraud at Tingo Mobile Limited ("Tingo Mobile"),[1] a Nigerian company he founded that purports to source and supply mobile handsets and related data application services to millions of Nigerian farmers, but which, in reality, does no such thing. As detailed below, this company and its purported operations are a fiction, invented by Mmobuosi out of whole cloth. To support the ruse, Mmobuosi orchestrated a scheme to create an elaborate set of fabricated financial statements and other falsified supporting documents. These fraudulent materials portrayed Tingo Mobile as a profitable and successful enterprise with hundreds of millions in revenues and an active userbase of over 9 million customers. And they were made-up: Tingo Mobile's authentic bank statements show that the company was, and is, dormant and broke.

Mmobuosi used this artifice to enrich himself and gain access to the U.S. capital markets. In 2020, he restructured Tingo Mobile to put it under the ownership of TIH, a U.S.-based holding company he established and controlled. He then fraudulently orchestrated the successive acquisitions of Tingo Mobile by two publicly-traded U.S. companies: (i) first selling the company from TIH to OTC-traded Agri-Fintech (then named "iWeb, Inc.") in August 2021; and (ii) then selling it again in December 2022 from Agri-Fintech to Nasdaq-listed Tingo Group (then called "MICT, Inc."). Each merger assigned a value to Tingo Mobile in the billions of dollars—valuations supported purely by the fabricated financial statements Mmobuosi directed and the sham operational success they purported to depict. Through these mergers, Mmobuosi assumed control of two publicly-traded U.S. corporations, obtaining for himself hundreds of millions of shares in the newly merged companies, as well as access to a public market for their disposal.

---

[1] Tingo Mobile initially did business as "Tingo Mobile PLC," but was renamed Tingo Mobile Limited in November 2022. DiBattista Decl. Ex. 134.

Mmobuosi has used these public companies as a vehicle to further his fraudulent misconduct. After taking the helm of Agri-Fintech and Tingo Group, Mmobuosi knowingly, or with reckless disregard, caused Tingo Mobile's fictitious transactions to be recorded in those companies' books and records and reported in their SEC filings, press releases, investor presentations, and other public disclosures, many of which Mmobuosi directly made and/or certified. As a result, Agri-Fintech and Tingo Group materially overstated their reported sales, earnings and assets in their publicly-disclosed financial statements for each reporting period in which each owned Tingo Mobile as its principal operating subsidiary. These material misstatements created the false impression that Tingo Mobile was a thriving, multimillion-dollar business when in fact its operations and earnings were fabricated—artificially propping up the price of their shares and Mmobuosi's controlling stake in them.

In early 2023, Mmobuosi replicated the Tingo Mobile fraudulent scheme with a new entity, Tingo Foods PLC ("Tingo Foods"), a purported food processor. As with Tingo Mobile, Mmobuosi contrived Tingo Foods from thin air—concocting a fictitious business model predicated on non-existent customers and backed by forged financial and bank statements and other falsified documents. In February 2023, Mmobuosi sold Tingo Foods to Tingo Group for over $200 million, causing Tingo Group to incorporate and report Tingo Foods' fabricated financial results, in addition to Tingo Mobile's, thereby compounding the fraud.

Defendants sustained their fraud through their systematic deception of company auditors. Under Mmobuosi's control, the Corporate Defendants provided their auditors and others a raft of fake bank statements, falsified general ledgers, and other forged and doctored documents to support their fabricated financial results. Defendants have even resorted to impersonating their fictitious customers and suppliers through fake email addresses to dupe auditors into believing that these made-up business partners exist when they do not.

Defendants' fraud was partially exposed on June 6, 2023 by the publication of a report by a research analyst firm, Hindenburg Research, which stated that Tingo Group was "an exceptionally obvious scam with completely fabricated financials." The report's publication prompted a precipitous drop in the share prices of both Tingo Group and Agri-Fintech.

In response, Defendants have doubled down on their lies. They have issued a series of denials of Hindenburg's report, insisting defiantly, and contrary to reality, that Tingo Mobile's and Tingo Foods' nonexistent businesses and fabricated revenues are legitimate. They continue to represent these companies' fabricated operations as true in their public filings and elsewhere—to this day, Defendants are still preparing and filing false financial statements, and still publicly issuing press releases attesting to the accuracy of Tingo Mobile's and Tingo Foods' knowingly false financial results.

Meanwhile, as detailed further below, Mmobuosi is reaping millions of dollars in illicit profits both through illegal insider sales of large blocks of Agri-Fintech and Tingo Group shares he obtained through the mergers he fraudulently induced, and by looting Tingo Group's assets.

The Commission accordingly submits this application to (i) temporarily restrain and preliminarily enjoin Defendants from violating the anti-fraud, record-keeping and accounting controls provisions of the federal securities laws; (ii) freeze Mmobuosi's assets and accounts he controls and order repatriation of foreign assets; (iii) enjoin the Corporate Defendants from transferring any money or property or issuing new shares of stock to Mmobuosi; (iv) restrain and enjoin the Defendants from selling their holdings of Agri-Fintech and Tingo Group stock; and (v) order a sworn accounting and document preservation order to assure compliance with the above described freeze. The Commission submits that such relief is necessary to halt Defendants' fraud, preserve the status quo, prevent further corporate and investor asset dissipation, and ensure the Commission is able to collect on any disgorgement order or other monetary sanctions the Court

may ultimately enter.  For these reasons, as described further herein, the Court should enter the Commission's proposed order containing a temporary restraining order with all the relief requested and order Defendants to show cause why the relief should not continue until a final judgment is entered.

## STATEMENT OF FACTS

### I.     TINGO MOBILE AND TIH.

Tingo Mobile is a private Nigerian company founded by Mmobuosi in 2001 that purports to be in the business of leasing mobile phones to farmers through agreements with farming cooperative associations in Africa.  DiBattista Decl. Ex. 133, Ex. 1 at pp. 9-16.  It claims to generate revenues through its phone sales and leases, by providing airtime and data services, and through farmers' usage of Tingo Mobile's pre-installed, proprietary "Nwassa" platform on its handsets, which supposedly offers technological efficiencies to farmers in bringing produce to market.  *Id.* Ex. 1 at pp. 9-16.

According to Tingo Mobile's bank records, as of 2019, the company was a non-operational and effectively dormant enterprise.  *Id.* Ex. 72.  Between 2016 and 2019, its principal operating bank account, held at Guaranty Trust Bank ("GT Bank"), carried cash balances of between -$15.92 and $16.63, with no deposits or withdrawals made at all between June 2018 and December 2019.  *Id.*[2]

According to Mmobuosi, however, the picture was quite different: contrary to the portrait painted by its actual financial condition, Mmobuosi claimed that by 2019 Tingo Mobile had signed lucrative contracts to supply phones and data services with two farming cooperatives in Nigeria— and had purportedly generated hundreds of millions in revenues through these agreements by sourcing and supplying over 20 million phones to an existing userbase of 9.3 million farmers.  *Id.* Ex.

---

[2] Figures that are denominated in Nigerian Naira in the accompanying exhibits are presented herein as their USD-equivalents using mid-market rates from XE.com, an online foreign exchange and money transfer financial institution.

10; *see also id.* Ex. 13, Ex. 5 at pp. 5, 70, 77. As shown by Tingo Mobile's actual bank records, this was not true. *Id.* Ex. 72.

Mmobuosi schemed to use this yarn to gain access to the U.S. capital markets. Beginning in around the summer of 2019, he began to restructure Tingo Mobile to position it to list directly on a U.S. exchange. To meet baseline standards required of U.S.-listed companies in anticipation of its listing application, Mmobuosi implemented new, ostensive corporate governance and financial controls. Barker Decl. ¶ 7. Pitching growth opportunities in the telecommunications and fin-tech sectors within emerging African agricultural markets—and Tingo Mobile's supposed inroads in those markets—Mmobuosi recruited a Board of Directors with Peter R. Barker ("Barker") as its Independent Chair, constituted an Audit Committee, and recruited and appointed a new Chief Financial Officer to manage the company's finances. *Id.* ¶ 7; DiBattista Decl. Exs. 38, 40.

These new officers and directors were to oversee TIH, a Delaware holding company Mmobuosi created to serve as Tingo Mobile's U.S. parent as it went public. Barker Decl. ¶ 7. TIH was incorporated in January 2020 and undertook a share exchange with Tingo Mobile the next month, through which TIH became Tingo Mobile's sole shareholder, with Mmobuosi as TIH's CEO. *Id.* ¶ 7; DiBattista Decl. Exs. 37, 39.

### A. Mmobuosi Knowingly or Recklessly Causes the Manufacture and Dissemination of False Financial Statements for Tingo Mobile.

To support the fiction that Tingo Mobile was a lucrative and growing business—and to conceal the reality that it had almost no assets or operations—Mmobuosi generated false financial statements. Between June 2019 and January 2020, while readying to incorporate TIH, Mmobuosi sent Barker three different and separate sets of financial statements purporting to present Tingo Mobile's financial results and conditions: (i) on June 12, 2019, Mmobuosi sent Barker three Tingo Mobile financial statements covering fiscal years 2016 through 2018, purportedly audited by a Nigerian chartered accounting firm, B.M. Okebunmi ("Okebunmi Statements"), Barker Decl. ¶ 9;

DiBattista Decl. Ex. 64; Mele Decl. ¶ 7; (ii) on December 27, 2019, Mmobuosi sent Barker a new financial statement covering Tingo Mobile's 2016 fiscal year, this time purportedly audited by a Nigerian chartered accounting firm called "Nominobro Ltd." ("Nominobro Statement"), Barker Decl. ¶ 9; DiBattista Decl. Ex. 65; Mele Decl. ¶ 8; and (iii) on January 3, 2020, Mmobuosi sent Barker four more financial statements for Tingo Mobile—these covering the fiscal years 2017-2019 and the three-month period ending September 30, 2019, each of which was purportedly audited or reviewed by still another Nigerian chartered accounting firm, Soloanke and Suleimanu ("Soloanke Statements"), Barker Decl. ¶ 9; DiBattista Decl. Ex. 66; Mele Decl. ¶ 9.

These financial statements, purporting to present the financial condition of the same company during the same overlapping periods, were radically inconsistent—reporting massive differentials from each other across many of Tingo Mobile's financial metrics—and were riddled with obvious errors. For example, the same revenues, profits and cash balances reported in the Okebunmi Statements for Tingo Mobile's fiscal years 2017 and 2018 were reported as having occurred in entirely different fiscal years (2018 and 2019) in the Soloanke Statements. *Compare* DiBattista Decl. Ex. 64, *with id.* Ex. 66; *see also* Mele Decl. ¶¶ 7, 9. And the Nominobro Statement reported every financial metric on the "Statement of comprehensive income and retained earnings" for fiscal year 2016 as a negative number. DiBattista Decl. Ex. 65 at p. 7; Mele Decl. ¶ 8.

In addition, from August through November 2020, Mmobuosi provided or directed others to provide Barker with multiple drafts of still *another* set of financial statements for Tingo Mobile's 2017-2019 fiscal years, purportedly audited by a different accounting firm than the previous three, this time named Olayinka Oyebola & Co. ("Olayinka"). Barker Decl. ¶ 9. The final set of Olayinka financial statements for Tingo Mobile's 2017-2019 fiscal years was provided to Barker on November 4, 2020 ("Olayinka Tingo Mobile Statements"). *Id.*; DiBattista Decl. Ex. 69; Mele Decl. ¶ 10. These

statements, too, were materially inconsistent from one another and from the statements that preceded them.  *Compare id., with id.* Exs. 64-66; *see also* Mele Decl. ¶ 10.

The series of multiple financial statements were consistent, however, in that each materially deviated from Tingo Mobile's actual financial condition and results—reporting millions of dollars' worth of transactions and cash balances reflected nowhere in Tingo Mobile's actual bank records. *Compare* DiBattista Decl. Exs. 64-66 & 69, *with* Ex. 72; *see also* Mele Decl. ¶¶ 7-10.

### B. Mmobuosi Knowingly or Recklessly Causes the Manufacture and Dissemination of False Financial Statements for TIH.

On September 2, 2020, Mmobuosi provided Barker with an Olayinka-reviewed financial statement for Tingo Mobile's U.S. parent, TIH, for TIH's first half of 2020.  Barker Decl. ¶ 17; DiBattista Decl. Ex. 67; Mele Decl. ¶ 11.  On September 16, 2020, Mmobuosi sent a revised version of TIH's financial statement for the first half of 2020 (together with the September 2 statements, the "Olayinka TIH Statements").  Barker Decl. ¶ 19; DiBattista Decl. Ex. 68; Mele Decl. ¶ 11.[3]

These two versions of the Olayinka TIH Statements sent two weeks apart clashed with one another, with the September 16 statement presenting vastly different cash balances and profits than the September 2 statement, and with no explanation offered for the discrepancy.  Barker Decl. ¶ 19; *compare* DiBattista Decl. Ex. 67, *with id.* Ex. 68; *see also* Mele Decl. ¶ 11.  Both versions of the Olayinka TIH Statements were also massively discrepant from the other sets of Tingo Mobile financial statements Mmobuosi had previously provided, and from Tingo Mobile's actual and dire financial position reflected in its bank statements.  Barker Decl. ¶ 19; *compare* DiBattista Decl. Exs. 67-68 (TIH Financial Statements), *with id.* Exs. 64-66 & 69 (Tingo Mobile Financial Statements), *and with id.* Ex. 72 (Tingo Mobile bank statements); *see also* Mele Decl. ¶¶ 7-11.

---

[3]  The September 16 Olayinka TIH Statement was revised further, with the final version circulated on November 4, 2020.  DiBattista Decl. Ex. 69; *see also* Mele Decl. ¶ 11.

### C.  Mmobuosi Obstructs Oversight Over Tingo Mobile's and TIH's Financial Reporting and Operations.

The apparent deficiencies in these financial statements—as well as numerous other observed weaknesses in Tingo Mobile's organization, infrastructure and operations—caused significant reservations among the TIH Board's Audit Committee about the company's health and viability. As detailed at length in the accompanying Declaration of Peter R. Barker, Mmobuosi repeatedly met the Board's efforts to obtain clarity on these matters with evasion, deflection and outright deceit. Among the concerns Barker and the TIH Audit Committee raised, but which Mmobuosi failed to answer satisfactorily (or at all):

- **Lack of any product:**  Barker requested Mmobuosi provide a prototype Tingo Mobile-branded phone so that he, as Board Chairman, could evaluate the company's core product and software.  Despite Mmobuosi's claim that Tingo Mobile had successfully supplied over 20 million phones to farmers across a wide swath of African farmland, Mmobuosi never once produced a phone to Barker.  Barker Decl. ¶ 12.

- **Lack of Staffing:** Barker also observed and questioned an apparent lack of organizational structure sufficient to manage a distribution function as extensive as Tingo Mobile's purported to be.  The Tingo Mobile organizational chart Mmobuosi produced showed only four management employees, and Mmobuosi refused repeated requests from Barker to make department heads available so he could confirm basic, corporate operational facts.  *Id.* ¶¶ 13-14; *see also* DiBattista Decl. Ex. 49 (9/18/2020 email from Barker to Mmobuosi: "How is it that a company with over $500,000 in revenue does not seem to have a management team other than yourself as CEO?").

- **Refusal to Produce Bank Statements:** Mmobuosi was persistently and particularly obstructive in responding to requests for bank statements to back up Tingo Mobile's stated cash balances.  When Barker broached the issue in January 2020, for example, Mmobuosi allowed him access to only a single cover page of an account statement from the company's operational account at GT Bank.  Barker Decl ¶¶ 11, 15; DiBattista Decl. Ex. 71.  The page provided was a transparent forgery—crudely doctored by super-imposing zeroes onto the listed credits and debits of Tingo Mobile's real bank statements to make the millions of Naira deposited or withdrawn into the account appear to be hundreds of billions of Naira.  *Compare* DiBattista Decl. Ex. 72 (Tingo Mobile's authentic GT Bank Statement), *with id.* Ex. 71 (GT Bank statement sent by Mmobuosi to Barker).

  - When TIH's Audit Committee later demanded to see full-period bank statements supporting Tingo Mobile's reported cash balances in March 2021, Mmobuosi refused, writing Barker emphatically: "we are not going to release our bank statements out," and adding "I strongly encourage you to understand that I know exactly what I'm doing here." Barker Decl ¶ 27; DiBattista Decl. Ex. 43.  Mmobuosi never provided the TIH Audit

Committee the requested bank statements.  *See* Barker Decl. ¶ 15.

- **Nonpayment of Expenses:**  Tingo Mobile and TIH consistently struggled to pay even basic bills. The companies routinely defaulted, or were significantly delinquent, on their obligations to company service providers for even nominal amounts, including TIH's transfer agent, lawyers and accountants—recurrent funding constraints that were seemingly incompatible with the ample cash reserves Tingo Mobile reported.  *See id.* ¶¶ 20-23; *see also* DiBattista Decl. Ex. 47 (9/11/2020 email from Barker: "why is there a lack of funds given the company history and reported revenues and what is potentially being covered up?  … The many financial statements and one alleged bank statement I have received for the past year have never indicated a problem with cash in Nigeria.  Something is not right.").

- **Management Resignations:**  TIH's and Tingo Mobile's payment failures extended to their employees.  In September 2020, after only three months in the role, TIH's CFO resigned via a letter copying TIH's Board, citing "the inability of the company to pay my monthly remuneration and the absence of the necessary tools and information required to effectively discharge my duties" as the bases.  DiBattista Decl. Ex. 48.[4]

- **Forbidding Auditor Contact:**  Having failed to receive satisfactory explanations from Mmobuosi, Barker called the engagement partner from Olayinka directly to obtain detail about the scope of its review, and the basis for its opinion on TIH's and Tingo Mobile's financial statements.  The auditor declined to speak with Barker.  Within minutes, Mmobuosi called Barker instructing him never to reach out to company auditors again and to direct all inquiries through Mmobuosi alone.  Barker Decl. ¶ 18.  Mmobuosi also refused the TIH Audit Committee's demand for a presentation by company auditors of TIH's financial statements and the bases for its audit opinion.  *Id.* ¶ 24; DiBattista Decl. Ex. 47 at p. 4.

- **Alleged Grant Thornton Engagement:**  Throughout 2021, Mmobuosi sought to assuage Barker and the TIH Audit Committee's concerns by telling Barker that he had engaged the Nigerian branch of the global auditing firm, Grant Thornton, LLP, to conduct the audit of TIH's consolidated financial statements pending regulatory review of TIH's listing application and registration statement.  Despite Mmobuosi's repeated promises that this firm's work was underway, neither Barker nor the TIH Audit Committee ever received any work product from the firm.  Barker Decl. ¶ 28.

---

[4] *See also id.* Ex. 47 (9/11/2020 email from TIH Audit Committee Member to Barker: "I spoke to [TIH's CFO] a few minutes ago.  He has not been paid and has stopped working … He is a bit uncomfortable about his position and the business because [he] has not seen anything on the ground to support the business – no bank statement, no underlying records, and he has seen only 4 staff members … Certainly there is a problem but my fear is that the problem may be much bigger than we think.").  Tingo Mobile's CEO (appointed to work under Mmobuosi, who was then TIH's CEO), also resigned, later suing TIH, Agri-Fintech and Mmobuosi for failing to pay him for his six months of work.  *See* Complaint, *Bhogal v. Tingo International Holdings, Inc., et al.*, No. 3:33-cv-0355 (D. Conn.), Dkt. No. 1.

### D. Mmobuosi Pursues a Direct Listing for TIH.

Despite the Board's outstanding and unanswered questions and concerns, Mmobuosi caused TIH to preliminarily pursue a direct listing on the Nasdaq exchange. On August 27, 2020, at Mmobuosi's direction, TIH submitted a direct listing application, and on September 30, submitted a draft Olayinka TIH Statement to Nasdaq. *See* DiBattista Decl. Ex. 41, 37; Barker Decl. ¶ 25. On November 9, 2020, TIH announced in a press release that it submitted a confidential draft registration statement to the Commission for its proposed public listing. DiBattista Decl. Ex. 10. In connection with the listing application and registration statement, Mmobuosi certified to the TIH Board that (i) the draft S-1 submitted to the Commission "is an accurate and complete description of the Company's operations and no adverse information has been withheld and not disclosed;" (ii) the Tingo Mobile and TIH financial statements "are accurate and fairly represent the financial condition of Tingo Mobile; " and (iii) "[i]n my capacity as CEO, I recommend that the [TIH] Board approve the S-1 for filing with the SEC." *Id.* Ex. 70.

TIH abandoned its listing efforts in or around the summer of 2021. Barker Decl. ¶¶ 29, 34. TIH shares were never registered, and its listing application was never granted.

## II. MMOBUOSI USES TINGO MOBILE'S FALSIFIED STATEMENTS TO FRAUDULENTLY INDUCE THE SALE OF TINGO MOBILE TO AGRI-FINTECH AND THEN TO TINGO GROUP.

After failing in his direct listing efforts, Mmobuosi pursued an alternative course: seeking a listing for Tingo Mobile through a reverse merger with an already-public company. In July 2021, capitalizing on the false success of Tingo Mobile that its phony financial statements depicted, Mmobuosi knowingly or recklessly secured OTC-traded Agri-Fintech's agreement to acquire Tingo Mobile at a $3.7 billion valuation—a vastly inflated figure nowhere near matching Tingo Mobile's true financial condition—thereby procuring for TIH (and derivatively, himself) a controlling stake in, and nearly one billion shares of, Agri-Fintech stock. DiBattista Decl. Ex. 13 (Aug. 19 2021 iWeb

Press Release), Ex. 12. A July 30, 2021 Agri-Fintech press release announcing the agreement touted that TIH "has posted a total revenue figure of $616 million dollars in 2020" and that Agri-Fintech was "confident that these figures will be exceeded going forward," noting Tingo Mobile's "over 9 million subscribers and [supply of] almost 30 million devices since 2014." *Id.* Ex. 11.

The merger was approved by TIH without convening a Board meeting and over the objection of Barker and the other member of the TIH Audit Committee. Barker Decl. ¶¶ 31-33. Among other things, Barker believed the deal lacked economic sense, and that Tingo Mobile was not a viable candidate for public trading on U.S. markets given his outstanding concerns and Mmobuosi's inability or refusal to answer them. *Id.* ¶¶ 29-31. Upon announcement of the TIH/Agri-Fintech merger agreement, Barker and TIH's other Audit Committee member resigned. *Id.* ¶ 33.

The merger closed in August 2021, making Mmobuosi the principal shareholder and CEO of a publicly-traded enterprise with Tingo Mobile as its only operating company. DiBattista Decl. Ex. 12. In Agri-Fintech's August 19, 2021 press release announcing completion of the merger, Mmobuosi stated: "This merger provides us with access to global debt and equity capital markets which will allow us to scale our proven model to support other countries across Africa." *Id.* Ex. 13. From August 2021 through November 2022, Tingo Mobile's financial results were consolidated into Agri-Fintech's and reported within financial statements presented in periodic reports Agri-Fintech filed with the Commission. Mele Decl. ¶ 16.

Just over a year later, Mmobuosi achieved his ambition of listing Tingo Mobile on a U.S. exchange. On December 1, 2022, Agri-Fintech sold Tingo Mobile to Tingo Group (then MICT, Inc.), a Nasdaq-listed public company, through a complex plan of merger in which Agri-Fintech— and therefore, Mmobuosi as Agri-Fintech's controlling shareholder—would acquire common and preferred stock of the new Tingo Group equal to 75% of the company on a fully converted basis.

DiBattista Decl. Ex. 1 at pp. 7-8. This merger, and its more-than $1 billion valuation of Tingo Mobile, was only possible because of the falsified financial statements and other documents created at Mmobuosi's direction, which portrayed Tingo Mobile as a growth company with ever-rising profits and abundant available cash. *See* Facts Section I, *supra*.

Following the merger, Mmobuosi was appointed CEO of "Tingo Group Holdings, LLC" ("TGH"), the Tingo Group corporate entity formed to oversee its African operating subsidiaries, including Tingo Mobile, which became Tingo Group's predominant business line. DiBattista Decl. Ex. 1 at pp. 9, 11. In the press release announcing the merger, Mmobuosi stated: "As a Nasdaq-listed company, we believe that new sources of capital for Tingo, together with our significant combined current cash balance, will enable us to continue investing in our range of product offerings, with the end result being further enhancement of the customer experience and, of course, new products and services." *Id.* Ex. 16.

Since its sale to Tingo Group in December 2022, Tingo Mobile's financial results have been consolidated into Tingo Group's and reported within financial statements presented in periodic reports Tingo Group filed with the Commission. Mele Decl. ¶ 16. Agri-Fintech, having sold its sole operating subsidiary, became a public holding company, with its predominant asset consisting of its equity stake in Tingo Group. DiBattista Decl. Ex. 9 at pp. 3-5.

## III.   MMOBUOSI KNOWINGLY OR RECKLESSLY CAUSES THE FALSIFICATION OF AGRI-FINTECH'S AND TINGO GROUP'S BOOKS AND RECORDS.

Since becoming a subsidiary of a public company in August 2021, Tingo Mobile's finances and operations have become subject to periodic reporting requirements and attendant review by U.S.-based independent auditors. In response to the added scrutiny on Tingo Mobile's finances by auditors and investors, Mmobuosi and Tingo Mobile have resorted to increasingly elaborate forgeries and deceptions to bolster the fiction they created and to conceal their fraud.

13

Agri-Fintech and Tingo Group provided to their independent auditors—and Tingo Group produced to Commission staff in the investigation of this matter—a set of monthly bank statements purportedly held in Tingo Mobile's primary operational account (with the United Bank for Africa ("UBA")), for at least the January 2021 through 2023 period. These statements show hundreds of millions of dollars in financial transactions coming in and out of the account, and balances as high as $194.7 million. *See* Mele Decl. Ex. A; DiBattista Decl. Exs. 74-79. Agri-Fintech and Tingo Group also provided their independent auditors monthly account statements from fixed deposit accounts purportedly held in the name of Tingo Mobile at UBA showing balances from a low of $24 million in January 2022 to a high of $489 million in March 2023. *See* DiBattista Decl. Ex. 138; *see also* Mele Decl. ¶ 27 & Ex. D.

In the Commission's investigation of this matter, UBA produced to Commission staff actual bank statements for Tingo Mobile's operating accounts, including one bearing the same account number as the statements Tingo Group produced. Mele Decl. ¶ 17 & Ex. B; DiBattista Decl. Exs. 84-86. These authentic bank statements show that Tingo Mobile did not even open its UBA operating accounts until February 2021, and retained balances of only a miniscule fraction of what appears in the alternative set Agri-Fintech and Tingo Group supplied their auditors. *Id.* For example, as of January 1, 2023, Tingo Mobile's fictitious bank statement showed an opening balance of over ₦87 billion (~$192 million), while its actual bank statement showed an opening balance of less than ₦6,000 (~$13.20). *Compare* DiBattista Decl. Ex. 78 at p. 1, *with id.* Ex. 85 at p. 95. Similarly massive discrepancies between the authentic and inauthentic Tingo Mobile operating account statements persist across the entire 2021-2023 period. Mele Decl. Ex. C. UBA also confirmed that Tingo Mobile has never maintained a fixed deposit account. *Id.* ¶ 19; DiBattista Decl. ¶ 89.

Defendants also prepared a fictitious general ledger to support these fabricated bank balances, with journal entries corresponding to the made-up deposits and withdrawals in their forged

bank statements, as well as false invoices, remittances, contracts and other falsified documents to lend further credibility to their forged bank statements and the fictitious transactions they portrayed. Mele Decl. ¶¶ 15-16; DiBattista Decl. Exs. 97-99 (ledgers); 103 (sample contracts); 104 (sample letters and affidavits) 105 (sample invoices), 106 (sample delivery notes); 107 (sample remittances). Agri-Fintech and Tingo Group used these bank statements, ledgers, and other forged supporting material to prove up to its auditors—and ultimately portray to investors in their periodic filings, regular press releases and other communications—that Tingo Mobile was a thriving business, sourcing millions of mobile handsets from phone suppliers and re-selling or leasing them to a massive customer base using proprietary, pre-installed Tingo Mobile data packages and applications.

Through these falsified records, Mmobuosi and Tingo Mobile invented out of whole cloth an entire multi-national telecommunication and fintech ecosystem, with Tingo Mobile connecting African farmer customers with international phone suppliers, generating accelerating data demand and usage across Tingo Mobile's proprietary platforms. And almost none of it was real or reflective of Tingo Mobile's true financial condition. For example:

- **UGC:** Tingo Mobile and/or its public corporate parents (Agri-Fintech and Tingo Group) have stated publicly that Tingo Mobile's principal phone supplier is a company named some iteration of "UGC Technologies" ("UGC"). DiBattista Decl. Ex. 1 at p. 21; Ex. 5 at p. 27; Ex. 30. From January 2021 through September 2023, Tingo Mobile's fake bank statements and fraudulent general ledger—provided to Agri-Fintech's and Tingo Group's auditors— reflect close to $2 billion in payments to UGC between January 2021 and June 2023, transactions purportedly backed by purchase agreements, sales invoices and delivery notes. *See* Mele Decl. ¶ 26. But Tingo Mobile's actual bank statements for the same account show that Tingo Mobile has never made a single payment to any entity named "UGC" or any variant of it. *Id.*

  o Tingo Mobile employees bought the domain name "@ugctechnologies" from a domain registry, DiBattista Decl. ¶ 116 & Ex. 111, and two days later, an email account from that domain sent company auditors a purportedly "independent" verification of the balances Tingo Mobile owed UGC, *id.* Ex. 109.

- **Bullitt:** Tingo Group also publicly disclosed in its Form 10-K filed with the Commission on March 31, 2023 that its only other mobile phone supplier was Bullitt Mobile Group ("Bullitt"). *Id.* Ex. 1 at p. 21; *see also id.* Ex. 30 (8/30/2023 press release disclosing same). Tingo Mobile's

fictitious bank statements report that Tingo Mobile paid around $61.4 million in expenses to Bullitt over the course of 2022. Mele Decl. ¶ 26. Corresponding journal entries in Tingo Mobile's general ledger reported that these were payments for 287,508 cellular phones. DiBattista Decl. Ex. 97. But Tingo Mobile's actual bank statements show that Tingo Mobile never made any payments to Bullitt from its UBA operating account. Mele Decl. ¶ 26. Bullitt has not received any money from any source related to Tingo Mobile save for a single payment (from a U.S.-based account of a Tingo Mobile affiliate) of $162,000 towards the purchase of 1,000 phones. *Id.* ¶¶ 26, 54; Lynch Decl. ¶¶ 8, 15-16; DiBattista Decl. Ex. 90 at Row 67; Ex. 30 (admitting Tingo Group has purchased only 1,000 phones from Bullitt).

- **African Farming Cooperatives:** Since at least 2019, Tingo Mobile (and its parent companies) have publicly claimed that the bulk of its subscriber base—9.3 million farmers—has resulted from its ongoing partnerships with two Nigerian farming cooperatives: (i) Ailoje Royal Farmers Multipurpose Cooperative ("Ailoje"), which purportedly leased 4.844 million handsets for its farmer members, and (ii) and the Kebbi Multi-Purpose Cooperative Society ("Kebbi"), which purportedly leased another 4.5 million handsets for its members. DiBattista Decl. Ex. 30; *see also id.* Ex. 10. Tingo's fictitious bank statements and ledgers report Tingo Mobile's receipt of over $1 billion in lease payments from these cooperatives. Mele Decl. ¶ 24. Tingo Mobile's actual bank statements do not reflect any payments from either Ailoje or Kebbi. *Id.*

  o As with UGC, Tingo Mobile employees registered domains in the names of these entities, DiBattista Decl. Exs. 112–13; email addresses from these domains were then used to send company auditors supposedly "independent" third-party confirmations of their existing contractual relationships with Tingo Mobile. *id.* Exs. 116–18.[5]

- **"Nwassa" Revenues:** Tingo Mobile and its successive parent companies also claimed to generate significant revenues from farmers' use of its pre-installed, proprietary "Nwassa" software on its branded phones, which purportedly facilitated agri-business by providing farmers direct market access, without middlemen. DiBattista Decl. Ex. 1 at pp. 9, 15–16, Ex. 5 at pp. 5, 31–36. Tingo Mobile employees told Tingo Group's auditors that revenues from its customers' use of this platform were received, processed and recorded in its bank statements through its payment gateway, "Paystack." *Id.* Exs. 121–122. Tingo's fictitious bank statements and general ledger reflect Tingo's receipt of $245,191,119 from "Internal Transfers – Paystack" during 2021 and $641 million from "Paystack Airtel" during 2022, supposedly reflecting income earned from its Nwassa business. Mele Decl. ¶ 24. Tingo's actual bank statements do not reflect any payments received from Paystack or Paystack Airtel. *Id.*

---

[5] Tingo Mobile's fictitious bank statements also report significant deposits from other African cooperatives, including (i) the Nigerian Police Force Cooperative Society ("NPF") (around $600 million) (ii) the All Farmers Association of Nigeria ("AFAN") (around $4.2 million); and (iii) the Ashanti Investment Trust ("Ashanti") (around $3.8 million). *See* Mele Decl. ¶ 24; DiBattista Decl. Exs. 74-79. Tingo Mobile's actual bank statements reflect no payments from these entities either. Mele Dec. ¶ 24; DiBattista Decl. Exs. 84-86. And, as with Kebbi and Ailoje, email addresses used to communicate with Tingo Mobile's auditors from these cooperatives were sent from domains bought and registered by Tingo Mobile employees. DiBattista Decl. Exs. 114-116, 119-120.

## IV. MMOBUOSI COMPOUNDS THE FRAUD BY INVENTING TINGO FOODS.

Mmobuosi founded Tingo Foods, PLC ("Tingo Foods") in September 2022, and personally sold it to Tingo Group in February 2023 in exchange for a $204 million, two-year promissory note carrying a 5% interest rate. DiBattista Decl. Ex. 1 at pp. 9, Ex. 20. Tingo Foods purports to be a food processing company that, at the time of its sale to Tingo Group, had earned $400 million in revenues in the first four months of its existence despite not having processed any food. *Id.* Ex. 1 at pp. 9, 11, 14, Ex. 20. Since its February 2023 sale, Tingo Foods has been a wholly owned subsidiary of Tingo Group; its financial results have been consolidated into Tingo Group's and reported within financial statements presented in periodic reports Tingo Group filed with the Commission. Mele Decl. ¶ 31.

As with Tingo Mobile, Tingo Foods is an elaborate fiction. Mmobuosi has knowingly or recklessly reproduced the Tingo Mobile fraudulent scheme with a different vehicle—inventing transactions, revenues and expenses out of thin air and manufacturing fake bank statements and ledgers to mask his deceptions.

Purported bank statements from Tingo Foods' primary operating bank account at UBA and corresponding general ledgers that Tingo Group provided its auditors—and produced to the Commission in the investigation of this matter—reflect inflows and outflows each exceeding $500 million between September 1 and December 31, 2022, with a year-end cash balance of $57 million. *Id.* ¶¶ 29, 36-38 & Ex. E, DiBattista Decl. Exs. 80-82 (bank statements), 100-102 (general ledgers). In the quarter ending March 31, 2023, this same set of bank statements reflects deposits and withdrawals both exceeding $250 million, and a closing balance of about $80 million—the vast majority of purported credits and debits concentrated among just a few, large customers and suppliers. Mele Decl. ¶¶ 36-38 & Ex. E; DiBattista Decl. Exs. 80-81.

By contrast, Tingo Foods' actual bank records produced by UBA for the same account number show that Tingo Foods did not even open this operating bank account until February 2023. Mele Decl. Ex. F; DiBattista Decl. Exs. 87-88. They also show that from March through September 2023, Tingo Mobile has maintained a balance of about $100, and, as of September 15, 2023, had only ever made three transactions (withdrawals totaling about $20) and none with any of the major suppliers and customers identified in the Tingo Group-produced statements. DiBattista Decl. 87-88; *see also* Mele Decl. Ex. F.

## V.    AGRI-FINTECH'S AND TINGO GROUP'S MATERIALLY FALSE PUBLIC STATEMENTS

From August 2021 through November 2022, Agri-Fintech incorporated Tingo Mobile's fictitious transactions and results into its books and records and reported these fabricated results in its publicly-disclosed financial statements. Tingo Group has done the same since its December 2022 acquisition of Tingo Mobile. And, since February 2023, Tingo Group has consolidated and reported Tingo Foods' fictitious transactions in its publicly-filed financial statements as well. As a result, because of Mmobuosi's fraudulent misconduct, Tingo Group and Agri-Fintech have knowingly or recklessly made materially false and misleading representations in every periodic report they filed with the Commission, as well as in many other public announcements, for each reporting period in which they controlled these subsidiaries. For example:

- Each financial statement in every periodic report filed by Agri-Fintech covering the period August 2021 through November 2022—including Agri-Fintech's Forms 10-K for the fiscal years 2021 and 2022, and its Forms 10-Q for the third quarter of 2021 and the first, second and third quarters of 2022—overstated the company's revenues, expenses and cash and cash equivalents by 100%. Mele Decl. Ex. C; DiBattista Decl. Exs. 4–9. As Agri-Fintech's CEO, Mmobuosi signed and certified each of the Company's periodic filings during this period, attesting to the material accuracy of the financial statements they presented. *See* DiBattista Decl. Exs. 4–9.

  - Christophe Charlier, co-Chair of Agri-Fintech's Board of Directors, refused to approve Agri-Fintech's FY 2022 Form 10-K. In an April 24, 2023 letter to Mmobuosi—which was also filed with the Commission—Charlier resigned from Agri-Fintech's Board, citing his "numerous efforts to implement best corporate government practices" that had been

"unanswered and unheeded." *Id.* Ex. 25.

- Each financial statement in every periodic report filed by Tingo Group covering the period after December 1, 2022—including Tingo Group's Form 10-K for the fiscal 2022, and its Forms 10-Q for the first and second quarters of 2023—overstated the company's revenues, expenses and cash and cash equivalents by upwards of 90%. Mele Decl. Exs. H-J; DiBattista Decl. Exs. 1–3.

- Numerous press releases, earnings conference calls and other company announcements repeated or amplified these falsehoods. For example, in a November 14, 2022 press release issued by Agri-Fintech, Mmobuosi boasted that "our revenues are tracking at almost $1.2 billion per annum," a knowing (or reckless) and material falsehood based on fictitious transactions nowhere reflected in Tingo Mobile's bank statements. *See* DiBattista Decl. Ex. 8. Similarly, on Tingo Group's March 31, 2023 earnings call, Mmobuosi touted Tingo Mobile's 9.3 million farmer customer base and Tingo Foods's generation of $400 million in its first four months of existence—both knowing (or reckless) and material falsehoods based solely on these entities fictious set of books. *Id.* Ex. 22. Defendants made myriad, comparable public misstatements throughout this period. *See e.g., id.* Exs. 11-28, 30-35, 137 (press releases and other public statements representing, among other things, Tingo Mobile's and/or Tingo Foods's purported operations, customer base and/or reported financial results).

## VI. DEFENDANTS PERSIST IN THEIR FRAUD EVEN AFTER HINDENBURG'S PARTIAL REVELATION OF IT AND THE COMMISSION'S IMPOSITION OF A TRADING SUSPENSION.

Before market open on June 6, 2023, a research analyst firm, Hindenburg Research ("Hindenburg") published a report ("Hindenburg Report") questioning the legitimacy of Tingo Group's stated finances and operations, accusing the company of being "an exceptionally obvious scam with completely fabricated results." *Id.* Ex. 132.

Among other things, Hindenburg reported (i) its "strong suspicion" that the significant cash balances Tingo Group claimed to hold at Nigerian banking institutions were fake; (ii) that its checks revealed that neither UGC nor Bullitt had supplied any handsets to Tingo Mobile; (iii) that Tingo Mobile's largest purported farming cooperative customers denied having any relationship with, or even having heard of, Tingo Mobile; (iv) that Tingo Mobile's Nwassa website had been inoperable and "under maintenance" for months despite Tingo Group's claims that the platform had generated hundreds of millions in revenues; and (v) that Tingo Foods' reported operating margins "are higher than every major food company on earth" despite Tingo Foods' lacking its own food processing

facilities and functioning solely as a "middleman" between farmers and third-party food processors. *Id.* Tingo Group's share price fell 48% the day the Hindenburg Report was published. Mele Decl. ¶ 61; DiBattista Decl. Ex. 135 (stock price chart for Tingo Group). The share price of Agri-Fintech, whose primary assets consist of its Tingo Group equity holdings, dropped 81% the same day. Mele Decl. ¶ 62; DiBattista Decl. Ex. 135 (stock price chart for Agri-Fintech).

In response, the same day, Tingo Group issued a press release titled "Tingo Group Refutes Malicious and Misleading Allegations in Hindenburg's Report" in which it noted, among other general denials of the allegations, that "[t]he Company also confirms that its accounting records are accurate and correct and that its financial results are accurately reported within its financial statements and its SEC filings." DiBattista Decl. Ex. 28. On June 8, 2023, Tingo Group issued a press release announcing its engagement of independent counsel to review the allegations made by Hindenburg. *Id.* Ex. 29.

On August 30, 2023, Tingo Group issued a press release announcing the completion of its investigation into Hindenburg's allegations. The press release asserted, among other things, that, following its investigation, Tingo Group had confirmed (i) the accuracy of the revenues reported by Tingo Foods in the first quarter of 2023; (ii) the accuracy of Tingo Mobile's reported "Nwassa" revenue; (iii) the accuracy of Tingo Mobile's and Tingo Foods' bank balances at each of several dates through review of bank statements, reconciliation of those statements to the company's accounting records, and video interviews with the relevant banks; (iv) the existence of Tingo Mobile's leasing relationships with Kebbi, Ailoje, AFAN and Ashanti; and (v) that "[s]ince 2020, Tingo Mobile has purchased phones from two suppliers," UGC and Bullitt. *Id.* Ex. 30. The day of the announcement, Tingo Group's share price increased 65%. Mele Decl. ¶ 64; DiBattista Decl. Ex. 135.

The Company issued further denials of Hindenburg's accusations by press releases issued on September 1 and September 6, 2023. DiBattista Decl. Exs. 32-33. Among other claims, these press

releases reiterated that the investigation had disproved Hindenburg's allegations and reaffirmed the accuracy of Tingo Group's reported cash balances and both the existence and legitimacy of its nonexistent cellular phone customers and suppliers. *Id.* These statements were false because, as described above, and as Mmobuosi knew or recklessly disregarded, the representations are contradicted by Tingo Mobile's and Tingo Foods' authentic and actual bank records.

On September 15, 2023, following the report of its investigation and the denial of the allegations, Tingo Group elevated Mmobuosi to be co-CEO of the company. *Id.* Ex. 34. In the company press release announcing his appointment, Mmobuosi commented, "we are delighted to report that the Company's cash balances have increased significantly to a current level of more than $400 million, thanks to a strong period of trade." *Id.* Tingo Mobile's and Tingo Foods' authentic bank records produced by UBA show a collective balance as of September 15, 2023 of about $90. *Id.* Exs. 85-87. The same day, Independent Director and Audit Committee member Robert Benton resigned from Tingo Group's Board. *Id.* Ex. 34.

On November 13, 2023, the Commission suspended trading in Tingo Group and Agri-Fintech stock for ten business days, beginning November 14, because of "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace" concerning, among other things, the financial statements and operations of Tingo Mobile and Tingo Foods. *See* SEC Rel. No. 34-98920 (Nov. 13, 2023) (Tingo Group suspension order); SEC Rel. No. 34-08921 (Nov. 13, 2023) (Agri-Fintech suspension order).[6] On November 14, 2023, the day the Commission's suspension orders became effective, Tingo Group put out still more inaccurate financial information regarding Tingo Mobile and Tingo Foods, issuing a press release reporting its earnings for the third quarter 2023. DiBattista Decl. Ex. 137. This third quarter earnings release—

---

[6] On November 28, 2023, following the automatic expiration of the Commission's trading suspension, Nasdaq initiated its own trading halt of Tingo Group shares. *See* DiBattista Decl. Ex. 139 (Nov. 29, 2023 Tingo Group Press Release).

which was also filed as Form 8-K on November 15 with an accompanying investor presentation—reported $20.2 million in net income for the quarter, cash and cash equivalents of $53.4 million as of September 30, 2023, and included comments by Mmobuosi touting a new contract Tingo Mobile purportedly signed to provide 6 million additional phones to a farming cooperative, as well as improved profit margins at Tingo Mobile.  *Id.*  On November 20, 2023, Tingo Group filed its Form 10-Q for the third quarter 2023, which Mmobuosi signed as the company's co-CEO and co-Principal Financial and Accounting Officer, reporting these same results.  *Id.*

Tingo Group and Agri-Fintech have also misled or refused to cooperate with the Commission's staff throughout its investigation of this matter.  Commission staff issued multiple investigative subpoenas to Tingo Group beginning in June 2023, and an investigative subpoena to Agri-Fintech in August 2023.  *Id.* ¶¶ 78, 142.  In response, Tingo Group produced many fabricated and forged documents, including the falsified bank statements and general ledgers described above, and Agri-Fintech produced one small set of documents—including some fabricated documents—and has since refused to further respond to the Commission's outstanding subpoena.  *Id.*

## VII.   MMOBUOSI IS PROFITING FROM HIS FRAUD.

By crafting the false narrative of Tingo Mobile's and Tingo Foods' success through false financial statements and forged documents, Mmobuosi knowingly or recklessly induced through fraudulent pretenses (i) Agri-Fintech to acquire Tingo Mobile from TIH, a company he controlled, through an all-stock merger in August 2021; (ii) Tingo Group to acquire Tingo Mobile from Agri-Fintech, a company he controlled, through an all-stock merger in December 2022; and (iii) Tingo Group to acquire Tingo Foods from Mmobuosi personally in February 2023.  *See* Facts Sections II, IV, *supra.*  Mmobuosi also received a 10 million share block of Agri-Fintech stock as part of Agri-Fintech's 2021 Employee Incentive Plan in October 2021, shortly after consummation of the TIH/Agri-Fintech merger.  DiBattista Decl. Ex. 126 at p. 6.  Through these transactions, procured

through fraud, Mmobuosi and entities he controls have amassed—and begun to sell or transfer—blocks of hundreds of thousands of shares of, and dominant market positions in, Agri-Fintech and Tingo Group stock, as well as money and property valued at hundreds of millions of dollars.

A.    **Mmobuosi's Illegal Insider Trading.**

Evidence indicates that Mmobuosi is liquidating or otherwise disposing of his stock positions. For example, between May and July 2023, Mmobuosi sold over 10 million shares of Agri-Fintech out of an account held in a Swiss bank, reaping over $2 million in proceeds, with almost all of those proceeds pre-dating the Hindenburg report and the consequent depreciation in Agri-Fintech's share price. *Id.* Exs. 128-131. Mmobuosi has not filed a Form 4 disclosing these sales. What Forms 4 and Schedules 13D Mmobuosi has filed disclose that he and/or TIH, which he controls, have sold or transferred at least 115 million shares of Agri-Fintech stock valued at close to $226 million since the beginning of 2022, and that Mmobuosi and/or TIH own an additional 839.5 million shares. *See id.* Ex. 126. Similarly, Forms 4 and Schedules 13D that Mmobuosi or Agri-Fintech have filed disclose that he or Agri-Fintech, which he controls, have sold at least 12 million shares of Tingo Group stock for $10.4 million between October and November 2023, and that Mmobuosi and/or Agri-Fintech own an additional 39.8 million shares of common stock. *See id.* Ex. 127. These values were inflated by Mmobuosi and the issuers' fraudulent reporting of overstated financial results.

In addition, without the relief requested here, Mmobuosi is set to come into hundreds of thousands more shares of Tingo Group in the weeks to come. As part of Agri-Fintech's sale of Tingo Mobile to Tingo Group in December 2022, Agri-Fintech acquired 25.8 million shares of Tingo Group common stock, as well as Series A and Series B Tingo Group Preferred Stock convertible to 362 million shares of common stock, representing an aggregate ownership of 75% of Tingo Group. *Id.* Ex. 1 at pp. 240–42. The conversion of Series A Tingo Group Preferred Stock

was completed in June 2023, and the conversion of Series B Tingo Group Preferred Stock is currently scheduled to occur by the end of 2023. *Id.* Ex. 35. On October 6, 2023, Agri-Fintech announced its intent to liquidate the company upon conversion of the Series B shares, which will result in Mmobuosi's acquisition of hundreds of millions of additional shares of—and a controlling stake in—Tingo Group common stock. *Id.* Ex. 36.

**B.      Mmobuosi's Misappropriation of Tingo Group's Assets.**

Mmobuosi has also exploited his control status to loot Tingo Group assets (i.e., legacy assets or new revenue from operating subsidiaries of the pre-merger predecessor companies still residing at Tingo Group). For example, in December 2022, Tingo Group approved a $10 million inter-company loan to Tingo Mobile for "funding costs relating to the purchase of smartphone handsets from its supplier, Bullitt." *Id.* Ex. 123 (Dec. 18, 2022 MICT Board Minutes). At Mmobuosi's direction, this $10 million was then routed from Tingo Mobile to Mmobuosi personally (or to other individuals for his benefit) through an attorney trust account on the basis that Mmobuosi had purportedly prepaid Bullitt the $10 million balance out of his own pocket. Mele Decl. ¶¶ 26, 58; DiBattista Decl. Exs. 124-125, 140; *see also id.* Exs. 93-94 (bank statement and wire transfer record reflecting payments). This was a lie: Bullitt never received $10 million from any source affiliated with Tingo Mobile. Lynch Decl. ¶¶ 15-16; Mele Decl. ¶¶ 26, 58; DiBattista Decl. Exs. 89-96.

Evidence shows an additional $16 million has been siphoned from Tingo Group's or its affiliates' accounts and transferred to Mmobuosi's personal accounts with no explanation. DiBattista Decl. Exs. 89-96 (bank accounts and wire transfer records showing transfers from Tingo Group's U.S. bank accounts to Mmobuosi). This combined $26 million of misappropriated corporate funds has been used by Mmobuosi for extravagant personal expenses, such as, among other things, the purchase of luxury cars, travel on private jets, a ballroom gala at a five-star hotel in

London, and a failed attempt to acquire an English Football Club Premier League team.  Mele Decl. ¶¶ 54–57; DiBattista Decl. Ex. ¶ 141.

Finally, Mmobuosi also fraudulently obtained a two-year promissory note from Tingo Group worth $204 million plus 5% interest per annum as consideration for his sale of Tingo Foods.  The value of the consideration obtained from Tingo Group by Mmobuosi was massively overstated and extracted only through the scheme led by and material misstatements made or caused by Mmobuosi.

## ARGUMENT

### I. DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS.

Because Defendants are engaged in a continuing scheme to defraud investors, the Court should grant temporary and preliminary injunctive relief to prevent them from continuing their scheme while this action is pending.  Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] entitle the Commission to temporary and preliminary injunctive relief against future securities law violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of repetition."  *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).  The Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," and therefore its burden to secure temporary or preliminary relief is less than that of a private party.  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  The Commission need not show irreparable injury, a balance of equities in its favor, or the unavailability of remedies at law.  *Id.*

The Commission meets this standard here.  The Commission has made a substantial showing that Defendants have violated the antifraud provisions of the Securities Act and Exchange Act, as well as the Exchange Act books and records violations and the other federal securities laws described in the Complaint.  Despite these violations—and in the face of a highly publicized analyst

report casting doubt on the veracity of their financial disclosures and the legitimacy of their operations—Agri-Fintech and Tingo Group continue to falsify and fraudulently present these companies' business lines and results in their public filings and elsewhere. Defendants are still preparing and filing false financial statements, still issuing press releases knowingly attesting to the truthfulness of Tingo Mobile's and Tingo Foods' blatantly false financial results, and have been withholding information from, and/or providing false information to, the investing public.

**A. The Commission Has Made a Substantial Showing that Defendants Violated the Antifraud Provisions of the Securities Act and Exchange Act.**

To establish a primary violation of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5, the Commission must show that the defendant: (1) used a fraudulent device or scheme or made a material misrepresentation or omission, (2) in connection with the offer or sale (under Section 17(a)), or in the purchase or sale (under Section 10(b) and Rule 10b-5), of securities, (3) with scienter.[7] *See SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016).

The Commission has made a substantial showing that Defendants' misconduct satisfies each of these elements.[8]

**1. The Commission Has Made a Substantial Showing That Defendants Made Material Misrepresentations.**

Defendants misled prospective investors concerning the financial condition of Tingo Mobile and, with respect to Tingo Group, Tingo Foods. Specifically, Defendants used these companies'

---

[7] The Commission must establish scienter to prove violations of Securities Act Section 17(a)(1) and Exchange Act Section 10(b) and Rule 10b-5. *See Aaron v. SEC,* 446 U.S. 680, 685 (1980). A showing of negligence is sufficient to establish a violation of Securities Act Sections 17(a)(2) and 17(a)(3). *Id.* at 696.

[8] To establish violations of these antifraud provisions and the registration provisions discussed below, the Commission must also satisfy the interstate commerce element. Here, that element is satisfied through, among other things, Defendants' use of wires and the internet to transmit and publish filings and press releases, and their use of phone calls and emails to carry out their scheme. *See SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 861 (S.D.N.Y. 1997) (Sotomayor, J.) (interstate commerce requirement is "broadly construed" and is satisfied by even "tangential mailings or intrastate telephone calls"); *SEC v. Nostra Energy, Inc.*, 202 F. Supp. 3d 391, 298-99 (2016) ("Inherently interstate methods of communication, such as the Internet or e-mail, constitute 'instrumentalities' of interstate commerce").

respective financial statements to mislead investors into believing that Tingo Mobile and Tingo Foods were real and thriving companies: (i) Mmobuosi and TIH used Tingo Mobile's financials to extract a multi-billion dollar valuation for the company upon its sale to Agri-Fintech; (ii) Mmobuosi and Agri-Fintech did the same in inducing Tingo Group's later purchase of Tingo Mobile; and (iii) Mmobuosi used Tingo Foods' financial statements to bring about its sale to Tingo Group for over $200 million. *See* Facts Sections II & IV, *supra.* Agri-Fintech and Tingo Group also publicly reported Tingo Mobile's (and, as to Tingo Group, Tingo Foods') financial and operational results in financial statements contained in their periodic reports filed with the Commission and other earnings reports. *See* Facts Section V, *supra.* Mmobuosi signed and certified Agri-Fintech's filings as its CEO, and he personally repeated and touted Tingo Mobile's and Tingo Foods' reported results on Tingo Group's earnings calls and in its press releases. *Id.*

In reality, Tingo Mobile's and Tingo Foods' financial statements and the lucrative business activities those statements portrayed were almost entirely fictitious: comprised of transactions they did not make with customers that did not exist, revenues they did not earn, and cash they did not have. As a result, the financial statements contained in Agri-Fintech's and Tingo Group's periodic and current reports filed with the Commission that incorporated these entities' results overstated their revenues and assets by upwards of 90%. Mele Decl. Exs. H-J.

These misstatements were not just false, but materially so. Information is material when "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A company's financial statements and earnings reports "are among the pieces of data investors find most relevant to their investment decisions." *SEC v. DiMaria*, 207 F. Supp.3d 343, 354 (S.D.N.Y. 2016); *see also In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998) ("financial reports are relevant to investment decisions"). Reasonable investors would consider very important

to their investment decisions that the results reported in Defendants' financial and earnings reports were mostly make-believe. And the precipitous price drops in Agri-Fintech's and Tingo Group's stock upon Hindenburg Research's partial revelation of the fraud confirms they did. *See SEC v. American Growth Funding II, LLC*, No. 16-CV-828 (KMW), 2018 WL 6322145, at *3 (S.D.N.Y. Dec. 4, 2018) ("In the context of public filings, it is well-established that movement in stock price shortly after disclosure of a misrepresentation (or lack of the same) is some evidence of materiality").[9]

### 2. The Commission Has Made a Substantial Showing that Defendants' Material Misstatements Were In Connection with the Purchase and Sale of Securities.

To establish that a fraud was "in connection with" the purchase or sale of a security, it is "enough that the fraud alleged 'coincide' with a securities transaction—whether by plaintiff or by someone else." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). "The Second Circuit has broadly construed the phrase 'in connection with,' interpreting the Congressional intent underlying the phrase to mandate only that the act complained of somehow induced the purchaser to purchase the security at issue." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537 (1999). This standard is met "where plaintiff's claims 'necessarily allege,' 'necessarily involve,' or 'rest on' the purchase or sale of securities." *Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010) (citations omitted). The Supreme Court has emphasized that this nexus requirement is "expansive enough to encompass the entire selling process." *United States v. Naftalin*, 441 U.S. 768, 773 (1979).

---

[9] Claims under Securities Act Section 17(a)(2)—asserted here against Mmobuosi, TIH and Agri-Fintech—require a showing that the defendant also "obtained money or property" by means of the charged misstatement. *See SEC v. Cole*, 12-CV-8167 RJS, 2015 WL 5737275, at *7 (S.D.N.Y. 2015); 15 U.S.C. § 77q(a)(2). The Commission has made that showing on the evidence presented because (i) Mmobuosi and TIH obtained money or property when it induced Agri-Fintech's acquisition of Tingo Mobile by means of Tingo Mobile's fraudulently inflated financials; and (ii) Mmobuosi and Agri-Fintech obtained money or property when they induced Tingo Group's acquisition of Tingo Mobile by the same means. *See* Facts Section II, *supra*. Mmobuosi also received incentive-based stock awards from Agri-Fintech, and profits from his Agri-Fintech and Tingo Group stock sales, holdings and profits that were artificially inflated by the company's overstated revenues and earnings. *See* Facts Section VII, *supra*.

Defendants' misrepresentations—made (i) to the investing public in corporate filings, issuer press releases, and on earnings calls; (ii) to merger partners in inducing their all-stock acquisitions of Tingo Mobile's business; and (iii) in listing applications to an exchange—fit easily within the breadth of the anti-fraud provisions nexus requirements. *See e.g. SEC v. Texas Gulf Sulphur Co*, 401 F. 2d 833, 862 (2d Cir. 1968) (misstatement is in connection with a security transaction when made "in a manner reasonably calculated to influence the investing public"); *SEC v. Wyly*, 788 F. Supp. 2d 92, 120 (S.D.N.Y. 2011) ("the 'coincide' requirement is broad in scope and extends to conduct that merely induces securities transactions") (citations and quotations omitted); *SEC v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017) (misstatements to exchange during listing process satisfy nexus requirement).

### 3. The Commission Has Made a Substantial Showing that Defendants Acted with the Requisite Scienter.

In making these material misrepresentations, Mmobuosi acted with scienter—that is, a "mental state embracing the intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter may be established either by showing "that defendants had both the motive and opportunity to commit fraud," or by demonstrating facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). Recklessness in this context means "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'" *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Evidence of "defendants' knowledge of or access to contradictory information" is sufficient to establish recklessness. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). As is evidence showing a defendant "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud,"

*Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), and/or evidence of defendants' "deliberate misconduct," *Wey*, 246 F. Supp. 3d at 915-16.

The evidence detailed above amply and substantially shows Mmobuosi's scienter. *First*, Mmobuosi had the motive and opportunity to commit fraud. As the founder, sole owner, and senior-most officer among a small handful of management-level executives with responsibility over the affairs and finances of Tingo Mobile and Tingo Foods, Mmobuosi exerted virtually complete control over these businesses. He thus plainly had the opportunity to overstate their profitability by causing and directing that fictitious transactions be recorded on their books and records. In so doing, he was motivated to—and did—achieve concrete personal benefits through his inducement of successive acquisitions of these entities. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("[s]cienter may be imputed … when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices."). In particular, Mmobuosi secured personal and substantial benefits through consideration for his successive sales of Tingo Mobile, and later Tingo Foods, at fraudulently inflated valuations. *See* Facts Section VII, *supra*.

*Second*, Mmobuosi's course of dealing with the TIH Board provide both direct and strong circumstantial evidence of his conscious misbehavior. *See generally* Barker Decl. Mmobuosi actively frustrated any oversight efforts by (i) manufacturing and sending forged "audited" financial statements and a doctored bank statement to support the fictitious cash balances he claimed; and (ii) obstructing and dissembling efforts to obtain basic verification of Tingo Mobile's reported results and operations. These affirmative deceptions, and his actions to prevent the truth from coming out, underscore his knowledge of (or at least his recklessness as to) the falsity of the financial information conveyed. *See SEC v. Collector's Coffee, Inc.*, No. 19-CIV-4355 (VM), 2023 WL 6453709, at *20 (S.D.N.Y. Oct. 4, 2023) ("The use of fabricated documents by itself shows that

defendants acted with scienter") (collecting cases); *SEC v. Collins and Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007) (Defendant "made false statements and provided the Audit Committee with false documentation … [T]hese allegations, taken together, are more than sufficient to plead both falsity and scienter.").

*Third,* the steady drumbeat of high-level resignations evidences scienter. TIH's CFO, Board Chairman and entire Audit Committee resigned because of, among other things, (i) corporate governance deficiencies; (ii) their inability to verify Tingo Mobile's reported finances and operations; and (iii) discomfort over the company's repeated failures to make payroll despite claiming to hold hundreds of millions of dollars in available cash. After Agri-Fintech's acquisition of Tingo Mobile, its Board Chairman too resigned noisily—pointedly refusing to approve the Company's Form 10-K—likewise citing concerns over corporate governance failures and "unanswered and unheeded" questions and recommendations. Courts in this district have found mass, high-level resignations of this sort highly probative of scienter. *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 117 & 126–27 (S.D.N.Y. 2013) (scienter properly alleged where "the CFO, two board members and the independent auditors resigned" because of, among other things, "concerns with the 'conduct of [company] management' and 'irregularities concerning the bank account balances for [the company's] subsidiaries'"); *Varghese v. China Shenghuo Pharmaceutical Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (board member's resignation over persistent control deficiencies "supports an inference of scienter").

*Finally*, context and common sense compel the inference of Mmobuosi's scienter. Mmobuosi founded, controlled, managed, and owned Tingo Mobile. That company, as it turns out, is a fiction, with nearly all its reported business consisting of fabricated and non-existent revenue and financial transactions. It generated an extensive paper trail of fabricated documentation to conceal its fraud, including falsified UBA bank statements and a corresponding general ledger, and

false contracts with significant customers and suppliers bearing Mmobuosi's signature. And Mmobuosi reaped millions of dollars in personal gains by inducing the company's acquisitions at fraudulent valuations supported by Tingo Mobile's fictitious financials.

Mmobuosi also founded, controlled, managed and owned Tingo Foods. That company is also, as it turns out, a fiction: its business likewise dependent upon revenues that do not exist purportedly earned from transactions that never took place. And it similarly concealed its fraud by generating reams of falsified back-up documentation, including fake UBA bank statements and a corresponding general ledger virtually identical to Tingo Mobile's, and with Mmobuosi's signature similarly affixed to the company's (apparently forged) material contracts with its customers and suppliers. And, as with Tingo Mobile, Mmobuosi personally cashed out by selling the company, likewise at a fraudulently inflated value justified by its fabricated financial results.

That a fraud of this size could happen at one company Mmobuosi founded, managed, and sold without his knowledge or recklessness is far-fetched. That it could happen twice extends beyond any outer bounds of credulity and common sense—particularly as Mmobuosi (a) repeatedly held himself out to investors as the person most knowledgeable about Tingo Mobile's and Tingo Foods' businesses in Tingo Group's earnings calls and press releases; and (b) was the person who profited most from the fraud's success. The sheer magnitude, scale and pervasiveness of the fraud that permeated not one, but two, entities Mmobuosi created and controlled compels the inference of his recklessness, at a minimum.

Mmobuosi's scienter can be imputed to the Corporate Defendants under principals of *respondeat superior. See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01, 105 (2d Cir. 2001). "Courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & McLennan Companies, Inc Sec. Litig.*, 501 F. Supp. 452, 481 (S.D.N.Y. 2006). A "management-level employee" is one "sufficiently senior to serve as a proxy" for the for

his corporate employer. *Patel v. L-3 Commc'ns Holdings Inc.*, 14-cv-6038 (VEC), 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016). Mmobuosi was a management-level employee of all three corporate defendants as (i) CEO of TIH; (ii) CEO of Agri-Fintech; and (iii) CEO of Tingo Group or CEO of Tingo Group's African operational subsidiaries under TGH, which accounted for at least 79% of Tingo Group's revenue base, *see* DiBattista Decl. Exs. 1-3; *see also* Mele Decl. Ex. J, and from which position Mmobuosi regularly spoke on the company's behalf on earnings' calls and in press releases. *See, e.g. In re Marsh & Mclennan*, 501 F. Supp. 2d at 483 (imputing scienter of CFO of the "largest and most prominent of [the parent company's business, generating approximately 60% of the Company's revenues" to the parent company); *Patel,* 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016) (subsidiary company CFO's scienter could be imputed to the parent corporation where CFO was "one management level down from the CEO and CFO of [the parent] and was responsible for a business segment comprising 36% of [the parent's] total business").[10]

### 4. The Commission Has Made a Substantial Showing That Defendants Engaged in a Fraudulent Scheme

Exchange Act Section 10(b) and Rules 10b-5(a) and (c) prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates as a fraud or deceit, in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(a), (c). Securities Act Sections 17(a)(1) and (a)(3) similarly prohibit any person from, in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates as a fraud or deceit. 15 U.S.C.

---

[10] Though not necessary given the ample evidence of Mmobuosi's scienter, which is attributable to the Corporate Defendants, a fraud of this magnitude—involving the fabrication of the entirety of the companies' core operative activities—would also allow a strong inference of the Corporate Defendants' collective corporate scienter even without regard to its individual employees' state of mind. *See In re Teva Sec. Litig.*, No. 3:17-CV-00558 (SRU), 2023 WL 3186407 (S.D.N.Y. May 1, 2023) ("a statement may be so 'dramatic' that collective corporate scienter may be inferred.") (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020)).

§ 77q(a)(1), (3). To establish a violation of these subparts, the SEC must show that Defendants, with scienter (or negligence under Section 17(a)(3)), committed a manipulative or deceptive act in furtherance of the scheme to defraud. *Wey*, 246 F. Supp. 3d at 915-16. The deceptive act forming the basis of the scheme claim must be "something beyond misstatements and omission." *SEC v. Rio Tinto PLC*, 41 F. 4th 47, 49 (2d Cir. 2022). A scheme liability claim requires a "showing that defendants participated in an illegitimate, sham or inherently deceptive transaction where their conduct or role had the purpose and effect of creating a false appearance." *SEC v. Sason*, 4333 F. Supp. 3d 496, 508-09 (S.D.N.Y. 2020) (citation and internal quotation marks omitted).

The Commission has made a substantial showing that Defendants employed many inherently deceptive acts in furtherance of their fraudulent scheme that, each and together, created the false appearance that Tingo Mobile and Tingo Foods were legitimate and profitable enterprises when they were not. Over several years, Defendants fabricated billions of dollars' worth of sham transactions with farmers, phone suppliers and food processors that never occurred, and manufactured a mountain of falsified documentation—including phony contracts, bank records, accounting ledgers, invoices, delivery slips and other fabricated documents—to mask their figmentary nature. Defendants also created and used web domains in their purported customers' and suppliers' names to disguise themselves as those customers and suppliers in communicating false confirmations to their auditors, *see* DiBattista Decl. Exs. 109, 111-120, an inherently deceptive act serving no purpose other than to obscure the fictitious nature of the transactions from company auditors. This demonstrated deceptive conduct amply makes out the Commission's scheme claims against Defendants. *See Collectors Coffee*, 2023 WL 6453709, at *20 ("reliance on fabricated documents … constitutes deceptive conduct") (collecting cases); *Sason*, 433 F. Supp. 3d at 509 (scheme liability adequately pled where defendants allegedly "condoned the creation of the falsified … documents and used them to facilitate" the scheme's ends); *Cole*, 2015 WL 5737275, at *8

(defendants' "backdating and fabricating work papers to deceive the PCAOB" held to be "inherently deceptive acts … plainly sufficient to plead a deceptive scheme").

**B.**   **The Commission Has Made a Substantial Showing that Mmobuosi Aided and Abetted the Corporate Defendants' Violations of the Anti-Fraud Provisions of the Securities Act and Exchange Act.**

The same misconduct also substantially shows Mmobuosi's liability as an aider and abettor of the Corporate Defendants' violations of the Securities Act's and Exchange Act's anti-fraud provisions.  To establish an aiding-and-abetting claim, the SEC must show: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party"; (2) knowledge or reckless disregard of this violation by the aider and abettor; and (3) "'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).

The Corporate Defendants' primary violations and Mmobuosi's knowledge of them are detailed above. *See* Argument Section I.A, *supra*.  As to his substantial assistance, Mmobuosi knowingly or recklessly orchestrated the fraudulent presentation of Tingo Mobile's and Tingo Foods' results and operations, and then used those false portrayals to precipitate these companies' successive sales to publicly-reporting companies, carrying those frauds forward onto the books and records and periodic filings of the companies' public parents.  By fraudulently inducing Agri-Fintech and Tingo Group to acquire his companies, Mmobuosi stood to (and did) gain control of millions of shares of these issuers' stock, as well as public market access for his sham companies.  As Agri-Fintech's and Tingo Group's largest shareholder and CEO, he stood to (and did) benefit further by causing them to incorporate his sham companies' false and overstated results into Agri-Fintech's and Tingo Group's in public filings to stimulate and maintain stock price inflation.  Thus, he "associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *Apuzzo*, 689, F.3d at 214.

### C. The Commission Has Made a Substantial Showing That Mmobuosi Engaged in Illegal Insider Trading.

Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder also prohibit undisclosed trading on material nonpublic corporate information by insiders owing a fiduciary duty of trust and confidence to their issuer employers and its shareholders. The secret misuse of such insider information for their personal advantage violates that duty and therefore constitutes a "manipulative or deceptive device or contrivance" falling within Section 10(b)'s proscriptions. *See Salman v. United States*, 580 U.S. 39, 41 (2016); *O'Hagan*, 521 U.S. at 651-52. The scienter and materiality standards set forth above for Section 10(b) claims apply to insider trading claims under the same statute. *See id.*; *SEC v. Obus*, 693 F. 3d 276, 286 (2d Cir. 2012).

Mmobuosi, either directly or through entities he controls, has also sold or transferred hundreds of millions of other shares of Agri-Fintech and Tingo Group. For example, between May and July 2023, while serving as an insider at both Tingo Group (as CEO of its African operating subsidiaries) and Agri-Fintech (as its CEO), Mmobuosi sold about 10 million shares of Agri-Fintech stock, yielding proceeds of more than $2 million. *See* Facts Section VII, *supra*. He did so knowing, or recklessly disregarding, that Agri-Fintech's and Tingo Group's publicly-reported financial statements incorporated falsified records and fictional transactions and were thus overstated. This information was plainly material and was never disclosed publicly.[11]

### D. The Commission Has Made a Substantial Showing that Mmobuosi Failed to Timely File a Form 4 with the Commission.

The above-described sale of 10 million shares of Agri-Fintech stock also substantially establishes Mmobuosi's liability under Exchange Act Section 16(a) and Rule 16a-3 thereunder. "Section 16(a) and Rule 16a–3 require every person who is a director or an officer of the issuer of

---

[11] Agri-Fintech's only asset at the time was its equity stake in Tingo Group.

securities to file a Form 4 with the SEC reporting any changes in beneficial ownership." *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 273 (S.D.N.Y. 2011); *see also* 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a–3. A Form 4 must be filed within two business days after execution of the officer's stock purchase or sale. *See* 17 C.F.R. §§ 240.16a–3(g)(1)). Claims under Section 16(a) and Rule 16a-3 thereunder do not require a showing of scienter to establish liability. *Verdiramo*, 890 F. Supp. 2d at 274, n.14.

Mmobuosi did not report his above-referenced May – July 2023 Agri-Fintech sales on Form 4 within the two-day window authorized under Rule 16a-3 (or ever), and he therefore failed to timely and accurately file a Form 4 with the Commission in violation of Section 16(a) and Rule 16a-3.

### E. The Commission Has Made a Substantial Showing that Agri-Fintech and Tingo Group Filed, and that Mmobuosi Aided and Abetted Their Filing of, False Periodic Reports with the Commission.

Section 13(a) of the Exchange Act and Rules 13a-l, 13a-11, and 13a-13 thereunder require issuers of securities registered pursuant to Section 12 of the Exchange Act to file with the Commission accurate annual, current and quarterly reports, as well as signed certificates by the CEO and CFO accompanying each annual or quarterly report. 15 U.S.C. 78m(a); 17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13. Rule 12b-20 of the Exchange Act requires that a company's statements and reports contain such further material information as may be necessary to make the required statements in the reports, in light of the circumstances under which they are made, not misleading. 17 C.F.R. § 240.12b-20. An issuer violates the reporting provisions if it files materially inaccurate reports or omits material information necessary to render the statements made in the reports not misleading. *See United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991). Proof of scienter is not required to establish a violation of these provisions. *McNulty*, 137 F.3d at 740-41.

As discussed above, Tingo Group and Agri-Fintech filed many materially inaccurate financial statements in Forms 10-K, 10-Q, and 8-K. In addition, each of the Forms 10-K and 10-Q

containing these misstatements included a certification, signed by the companies' respective CEO and CFO, which falsely stated that the report did not contain any untrue statement of material fact, and that the financial statements were fairly presented. Tingo Group and Agri-Fintech therefore violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-l, 13a-11, and 13a-13 thereunder.

Mmobuosi aided and abetted Tingo Group and Agri-Fintech's reporting violations by founding and controlling Tingo Mobile's and Tingo Foods' sham transactions and businesses, by orchestrating the manufacture of fake bank records and other forged documents to conceal his fraud from others, and by reviewing, approving, signing, and making public statements that he knew, or was reckless in not knowing, contained false financial and business information.

### F. The Commission Has Made a Substantial Showing that Mmobuosi Falsely Certified Agri-Fintech's Periodic Reports.

Rule 13a-14 of the Exchange Act requires that for every report filed under Section 13(a) of the Exchange Act, including Form 10–Q and 10–K financial reports, each principal executive and financial officer of the issuer must sign and certify the accuracy of the financial statements within the report. *SEC v. Rosenberger*, No. 22-CV-4736 (DLC), 2023 WL 1928093, at *6 (S.D.N.Y. Feb. 10, 2023).

As Agri-Fintech's CEO, Mmobuosi signed certifications accompanying Agri-Fintech's public filings covering the periods between August 2021 and November 2022, including its Forms 10-K, Forms 10-Q, and Forms 8-K. In them, Mmobuosi certified that the filings did "not contain any untrue statements of material fact," and that the financial statements contained in them "fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant." Contrary to Mmobuosi's certifications, these filings omitted material facts—that the Tingo Mobile revenues, assets and income they reported were fake—and thus did not fairly present Agri-Fintech's financial condition.

**G.    The Commission Has Made a Substantial Showing that Agri-Fintech and Tingo Group Violated, And Mmobuosi Aided and Abetted Violations of, the Securities Laws' Record-Keeping and Internal Control Provisions.**

Section 13(b)(2)(A) of the Exchange Act requires reporting companies to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). Section 13(b)(2)(B) of the Exchange Act requires reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP. 15 U.S.C. § 78m(b)(2)(B). No showing of scienter is required to establish a violation of either Section 13(b)(2)(A) or Section 13(b)(2)(B). *See McNulty*, 137 F.3d at 740-41.

Neither Tingo Group nor Agri-Fintech's books, records and accounts were maintained in accurate detail and both issuers failed to maintain a system of internal controls sufficient to do so because, as detailed above, each of these issuers manufactured falsified bank statements and recorded fictitious transactions in its books and records and reported the same in its financial statements. *See SEC v. 800america.com*, No. 02 Civ. 9046(HB), 2006 WL 3422670, at *10 (Nov. 28, 2006) (granting summary judgment on recordkeeping and control claims where, as here, issuer created and sent its auditors a set of falsified bank statements that materially contradicted the figures in authentic bank statements).

Mmobuosi knowingly or recklessly provided substantial assistance to Tingo Group and Agri-Fintech's violations of these recordkeeping and internal accounting controls provisions. He did so by, among other things, creating or directing the creation of the false financial statements and bank records, as well as other false records, to obscure from investors and auditors the fictitious nature of Tingo Mobile's and Tingo Foods's business. Mmobuosi knew or was reckless in not knowing that Tingo Mobile's and Tingo Foods's revenues and transactions were fabricated, and he

39

caused them to be recorded on Agri-Fintech's and Tingo Group's books and records, understanding and intending that these issuers' financial statements would be materially inflated as a result. This misconduct suffices to establish his aiding and abetting liability for Tingo Group and Agri-Fintech's violations of Sections 13(b)(2)(A) and (B).

**H. The Commission Has Made a Substantial Showing That Mmobuosi Directly or Indirectly Falsified Agri-Fintech's and Tingo Group's Books and Records and Circumvented These Issuers' Controls.**

This same misconduct also establishes Mmobuosi's liability under Section 13(b)(5) and Rule 13b2-1 thereunder. Exchange Act Section 13(b)(5) prohibits any person from knowingly circumventing or failing to implement a system of internal accounting controls or knowingly falsifying any book, record or account required to be made. 15 U.S.C. § 78m(b)(5). Rule 13b2-1 prohibits individuals from directly or indirectly falsifying or causing to be falsified any book, record or account required to be maintained by reporting companies. 17 C.F.R. § 240.13b-1. A violation of Section 13(b)(5) requires knowing conduct, but scienter is not required to establish a violation of Rule 13b2-1. *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393 (S.D.N.Y. 2014).

In the same ways and in the same manner as he aided and abetted Agri-Fintech's and Tingo Group's violations of the recordkeeping and internal control provisions, Mmobuosi also falsified or caused the falsification of these issuers' books and records and failed to implement and/or circumvented their internal accounting controls. *See, e.g. Softpoint, Inc.* 958 F. Supp. at 866 (Sotomayor) (granting summary judgment on 13b2-1 claim against company president who signed annual disclosure for "deciding to retain fictitious entries and payments in [the company's] accounts receivable ledgers."); *800america.com*, 2006 WL 3422670, at *11 (granting summary judgment as to violations of 13(b)(5) and Rule 13b2-1 against CFO who provided falsified bank statements to company auditors).

### I. The Commission Has Made a Substantial Showing that Mmobuosi Deceived Agri-Fintech's and Tingo Group's Auditors.

Exchange Act Rule 13b2-2(a) prohibits an officer or director from directly or indirectly making or causing to be made any materially false or misleading statement to an accountant in connection with any audit, review or examination of the financial statements of the issuer. 17 C.F.R. § 240.13b2-2(a). Exchange Act Rule 13b2-2(b) prohibits an officer from directly or indirectly taking any action to coerce, manipulate, mislead, or fraudulently induce any independent certified public accountant engaged in the performance of an audit or review of the issuer's financial statements required to be filed with the Commission. 17 C.F.R. § 240.13b2-2(b). A violation of Rule 13b2-2 does not require proof of scienter. *SEC v. Espuelas*, 579 F. Supp. 2d 461, 487 (S.D.N.Y. 2008).

Mmobuosi masterminded the Tingo Mobile and Tingo Foods fraud—a scheme that depended in large measure on the generation and provision of falsified evidence and other deceptive misconduct aimed at thwarting audit procedures that might have unearthed it. As detailed above, Mmobuosi oversaw and caused these companies' patterned deception of their auditors to cover their tracks through, among other things, the provision of forged and doctored documents and the fraudulent impersonation of company suppliers and customers.

### J. The Commission Has Made a Substantial Showing That Mmobuosi Has Failed to Comply with Section 304 of the Sarbanes Oxley Act of 2002.

Under Section 304 of the Sarbanes Oxley Act of 2002 ("SOX"), the CEO and CFO of an issuer required to prepare an accounting restatement to remedy material noncompliance with a financial reporting requirement resulting from misconduct must reimburse the issuer for (a) any bonus, incentive-based, or equity-based compensation, and (b) any profits realized from the sale of the issuer's securities, during a 12-month period defined by the statute. 15 U.S.C. § 7243(a).

Agri-Fintech's and Tingo Group's financials were (and remain) materially misstated and were (and remain) in material noncompliance with myriad financial reporting requirements resulting

directly from Mmobuosi's misconduct, and they require accounting restatements.  *See* FASB
Accounting Standard Codification ("ASC") 250 (when an error is material to previously-isssued
financial statements, the error must be corrected by restating the prior period statements); Staff
Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150, (1999) (financial misstatements are
presumptively material and require restatement if, among other things, they cause an issuer's
financial statements to be misstated by more than 5%).  As a result, the Commission has established
a violation of SOX 304(a), *see SEC v. Taronis Techs., Inc.*, 2023 WL 5625299, at *11 (M.D. Fla. Aug.
31, 2023), and entitlement to claw-back the compensation and profits specified by the statute that
Mmobuosi earned while CEO of Agri-Fintech and Tingo Group, including the Agri-Fintech share-
based awards granted to him upon his assumption of the CEO position, and proceeds from his
stock sales of Agri-Fintech and Tingo Group during the statutorily defined period(s).

### K. The Commission Has Made a Substantial Showing of Mmobuosi's Liability as a Control Person.

To state a claim for control person liability under Exchange Act Section 20(a) [17 U.S.C.
§ 78t(a)], the SEC must allege "(1) a primary violation by the controlled person; (2) control of the
primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense
a culpable participant in the primary violation.'"  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.
1998) (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

For purposes of Section 20(a), "control" means the "power to direct or cause the direction
of the management and policies [of the controlled entity], whether through the ownership of voting
securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2 (defining "control"); *see also In re Take-
Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 306 (S.D.N.Y. 2008).  Mmobuosi meets this standard
as the controlling shareholder and CEO of TIH and Agri-Fintech, who signed those companies'
violative misstatements.  He meets it as well as to Tingo Group as the CEO of TGH, the company's
largest operative subsidiary, and the corporate entity responsible for Tingo Group's overstated

financial results, and now as the CEO of Tingo Group. *See In re Alstom SA*, 454 F. Supp. 2d 187, 212 (S.D.N.Y. 2006) (finding control status met against senior officer of corporate subsidiary responsible for fraudulent financial reports of the subsidiary that were consolidated into parent company's financials).

Mmobuosi also culpably participated in the Corporate Defendants' primary violations because, for the reasons explained above, he acted with scienter in carrying out the fraudulent scheme and misstatements. *See Sason*, 433 F. Supp. 3d at 514–15 (culpable participation requires a showing of "the controlling person's conscious misbehavior or recklessness."); *In re Am. Intern. Grp. Inc. 2008 Sec. Litig.*, 741 F. Supp. 511, 535 (S.D.N.Y. 2010) ("allegations of scienter necessarily satisfy the culpable participation requirement).

### L.     Defendants Are Likely to Continue Their Illegal Conduct

Defendants are continuing to engage in fraudulent conduct. As detailed above, Tingo Group's and Mmobuosi's response to the Hindenburg Report's publication has been one of defiance: Tingo Group and Mmobuosi have doubled down on their lies, repeating and expanding upon their knowingly false claims that Tingo Mobile and Tingo Foods are massively profitable enterprises with legitimate operations. For example, on August 30, 2023, Tingo Group published a report falsely denying the Hindenburg Report's accusations; the same day, it also announced its earnings and filed its Form 10-Q for the second quarter of 2023, both of which deliberately and materially overstated Tingo Group's revenues (and other metrics) by incorporating Tingo Mobile's and Tingo Foods' fictitious transactions and fabricated bank statements. DiBattista Decl. Ex. 30. On September 15, 2023, Mmobuosi knowingly or recklessly announced in a press release that Tingo Group's had increased its cash reserves by over $400 million over the third quarter of 2023 when, in reality, Tingo Mobile's and Tingo Foods' cash balances at the time were less than $100. *Id.* Ex. 34. As recently as November 14, 2023—the same day the Commission's trading suspension became

effective—Tingo Group announced earnings for the third quarter 2023 and reported $20.2 million in net income and cash and cash equivalents of $53.4 million as of September 30, 2023, and Tingo Group filed its Form 10-Q for the same period on November 20, 2023, which was co-signed by Mmobuosi and Denos as Co-CEOs and Co-Principal Financial and Accounting Officers. *Id.* Ex. 137.

On this evidence, "there is a reasonable likelihood that the wrong[s] will be repeated," *Mgmt. Dynamics, Inc.*, 515 F.2d at 807, and a temporary restraining order and permanent injunction should be imposed to prevent Defendants from continuing to induce investments by knowingly misleading investors concerning the financial condition of Agri-Fintech and Tingo Group.

## II.     THE COURT SHOULD GRANT ADDITIONAL EQUITABLE RELIEF TO PROTECT INVESTORS

### A.     The Court Should Enter an Order Freezing Mmobuosi's Assets.

Federal courts in Commission enforcement actions have the authority to impose asset freezes as an exercise of their general equitable powers. 15 U.S.C. § 78u(d)(5). The purpose of such an asset freeze is to ensure that "any funds that may become due can be collected," *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990), and "to preserve the status quo by preventing the dissipation and diversion of assets," *SEC v. Infinity Grp.*, 212 F.3d 180, 197 (3d Cir. 2000). The Commission's burden of proof in connection with an asset freeze application is substantially lower than its burden of proof on an application for a preliminary injunction. *See Unifund SAL*, 910 F.2d at 1041. To obtain an asset freeze at this stage, the Commission need only show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws. *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011).

Here, an asset freeze over Mmobuosi's assets is warranted to preserve the status quo and to prevent the dissipation of assets. As detailed above, there is a high likelihood that the Commission succeeds not only on its fraud claims, but also on its claims under record-keeping and accounting

controls and other securities laws provisions detailed in the Complaint. Liability under any of these provisions could expose Defendants to an order of disgorgement or an order imposing civil penalties. The proposed asset freeze would ensure that funds are available to satisfy any final judgment the Court might enter ordering the payment of disgorgement, *see Unifund SAL*, 910 F.2d at 1041-42, and preserve this Court's ability to approve a fair distribution for victims of the fraud. Such relief is especially warranted here as Mmobuosi has already siphoned at least $26 million of corporate funds and converted them for his personal use on expenditures such as luxury cars, private planes, and a failed attempt to acquire a professional soccer team. An asset freeze is necessary to guard against any further dissipation of investor assets or assets that can be used to satisfy a judgment.

### B. The Court Should Order Mmobuosi to Repatriate the Proceeds of the Fraud.

The Commission also seeks a repatriation order requiring Mmobuosi to transfer to the registry of this Court any assets outside the territorial limited of the United States that were obtained or derived, directly or indirectly, from the fraud with which he is charged. Repatriation of these assets is appropriate because they represent unlawful proceeds of Mmobuosi's fraud, and Mmobuosi does not appear to have assets in the United States sufficient to satisfy the Commission's claims for disgorgement, prejudgment interest and civil penalties. *See, e.g., SEC v. Aragon Cap. Advisors*, L.L.C., No. 1:07- cv-00919, 2011 WL 3278642, at *10 (S.D.N.Y. July 26, 2011); *SEC v. Illarramendi*, No. 3:11cv78 (JBA), 2011 WL 2457734, at *7 (D. Conn. June 16, 2011). Courts often enter repatriation orders to enforce freeze orders of assets held abroad. *See, e.g., SEC v. Res. Dev. Int'l L.L.C.*, 160 F. App'x 368 (5th Cir. Dec. 21, 2005) (affirming asset freeze and repatriation order); *SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000); *SEC v. Aimsi Techs.*, Inc., 650 F. Supp. 2d 296 (S.D.N.Y. 2009).

According to bank records and other record evidence, Mmobuosi has misappropriated a $10 million "intercompany loan" originating from Tingo Group's U.S. corporate assets purportedly extended to enable Tingo Mobile to fund a $10 million balance owed to Bullitt; that money was diverted to Mmobuosi's personal account in the U.K. on the false pretense that he had pre-paid that balance out of his pocket—money Bullitt has confirmed under oath was never received.  *See* Facts Section VII, *supra*.  Between May and June of 2023, at least $16 million more in cash held in Tingo Group's U.S.-based accounts (which housed assets from its legacy businesses pre-dating the December 2022 Tingo Group merger) was routed to Mmobuosi's foreign accounts in London with no discernible explanation, and promptly spent on personal extravagances, like private planes, luxury vehicles, and a ballroom gala to support Mmobuosi's personal foundation.  *Id.*  Mmobuosi has also maintained at least $2 million in illicit profits from his illegal insider trading of Agri-Fintech stock in a Swiss brokerage account.  *Id.*  In light of Mmobuosi's transfer of money overseas, and the apparent absence of any domestic funds that could potentially be secured by an asset freeze, an order requiring him to repatriate assets is appropriate here.

### C. The Court Should Enter an Order Enjoining the Corporate Defendants from Transferring Money or Property or Issuing New Shares to Mmobuosi.

The Commission seeks an order restraining and enjoining the Corporate Defendants from transferring money or property or issuing new shares to Defendant Mmobuosi.  Such an order is within this Court's "authority to grant the full panoply of equitable remedies so that the SEC can obtain complete relief," *SEC v. Martino*, 255 F. Supp. 2d 268, 288 (S.D.N.Y. 2003), and is necessary to remove corporate assets from control of the very principal who operated them as a fraud, and to prevent Mmobuosi's further dissipation and diversion of corporate and investor assets.  As the CEO and controlling shareholder of each of the Corporate Defendants, Mmobuosi has direct or indirect access to the Corporate Defendants' bank accounts and could—as he already has—abuse his

authority to misappropriate additional corporate funds and further dissipate potential sources from which the Commission could recover a judgment.

In addition, because Mmobuosi has obtained significant value and control by fraudulently obtaining shares of the Corporate Defendants' stock, which he has then sold or used to pay others for services rendered, the Corporate Defendants should be restrained from issuing new shares of stock to Mmobuosi, which could further enable him to profit from the scheme. *See Smith*, 653 F. 3d at 129 (observing the "sweeping mandate manifest in the securities laws" and "the district court's broad equitable power to fashion ancillary relief when its jurisdiction under those laws has been involved").

### D. The Court Should Enter an Order Restraining Defendants from Selling Their Holdings of Agri-Fintech and/or Tingo Group Stock.

For similar reasons, the Commission also seeks an order enjoining the Defendants from selling their significant holdings of Agri-Fintech or Tingo Group stock. As of today, Mmobuosi, either directly or through entities he controls, owns at least 839.5 million shares of Agri-Fintech common stock, 39.8 million shares of Tingo Group common stock and 33.6 million shares of Tingo Group Series B Preferred stock (convertible to 336 million shares of common stock) and, as principal shareholder and/or CEO of each of the Corporate Defendants, he controls the disposition of these Defendants' considerable holdings of the same. Mmobuosi has obtained significant profit by selling Agri-Fintech and Tingo Group stock to unsuspecting investors, and evidence obtained by the Commission shows that Mmobuosi's pattern of selling this stock at inflated values is accelerating, with at least 11 million shares of Tingo Group sold by Mmobuosi or entities he controls in the past month.

### E. The Court Should Order Defendants to Produce a Verified Accounting.

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of all funds obtained as a result of fraudulent activity, as well as a measure of unjust

enrichment and a defendant's current financial resources. *See, e.g., SEC v. Lybrand,* No. 00 Civ. 1387 (SHS), 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000); *SEC v. OxTadrus Cap. Sec., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). Here, an accounting will confirm the measure of investor funds obtained by Defendants as a result of their fraudulent activity and the uses of such funds and is needed to ensure compliance with the freeze requested on Defendants' assets.

### F. The Court Should Enter an Order Prohibiting the Destruction of Documents.

To preserve documents that the Commission may later seek through discovery requests, the Commission seeks an order prohibiting Defendants from altering, destroying, or concealing documents, including documents concerning the Complaint's allegations or Defendants' assets or finances. Such orders are routinely granted "to preserve the status quo until a final resolution of the merits." *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-CV-2031 (DLI) (JMA), 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (citing 15 U.S.C. § 80b-6(1) and *Unifund*, 910 F.2d at 1040 n.11). In this case, such an order is particularly warranted given Defendants' demonstrated propensity for altering, doctoring and forging documents and evidence.

## III. THE COURT SHOULD ENTER AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED.

To avoid the expiry of the temporary restraining order after fourteen days under Federal Rule of Civil Procedure 65(b)(2), the Commission seeks an order requiring Defendants to show cause why a preliminary injunction, imposing the same relief set forth in any temporary restraining order the Court issues, should not be entered at a date and time set by the Court. The Commission can then present its evidence at a preliminary injunction hearing on notice.

## CONCLUSION

For the reasons set forth above, and in the accompanying declarations and exhibits, the

Commission respectfully requests that its emergency application be granted.

Dated:  New York, New York
       December 18, 2023

SECURITIES AND EXCHANGE COMMISSION

By:    /s/ David Zetlin-Jones
       David Zetlin-Jones
       Michael DiBattista
       New York Regional Office
       100 Pearl Street, Suite 20-100
       New York, NY 10004
       (212) 336-0978 (Zetlin-Jones)
       zetlinjonesj@sec.gov