**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                **Plaintiff,**<br><br>-against-<br><br>TINGO GROUP, INC., AGRI-FINTECH HOLDINGS, INC. (f/k/a TINGO INC.), TINGO INTERNATIONAL HOLDINGS, INC., and MMOBUOSI ODOGWU BANYE (a/k/a DOZY MMOBUOSI),<br><br>                **Defendants.** | 23 Civ. \_\_\_\_ (    ) |

   I, Peter R. Barker, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, that I am over 18 years of age, and that I am competent to testify to the matters stated herein:

   1.  I am a resident of Greene County, New York and have lived in New York for over 30 years.

   2.  I currently am retired, however, prior to my retirement, I was a financial adviser to several public companies and served as the CFO of two companies in the emerging markets space, including a telecommunications company.

   3.  From approximately January 2020 to July 30, 2021, I was the Chairman of the Board of Tingo International Holdings, Inc. ("TIH") as well as a member of TIH's Audit and Corporate Governance Committees.

   4.  I became involved with TIH through Dozy Mmobuosi, the founder and CEO of Tingo Mobile PLC ("Tingo Mobile"), to whom I was introduced in approximately spring 2019 by a mutual contact.

5.      In the summer of 2019, Mmobuosi told me that he was seeking to create a U.S.-based holding company to be called TIH for Tingo Mobile, a Nigerian company in the business of leasing mobile phones to farming cooperatives and other collectives in Nigeria. Mmobuosi stated that his goal was to create an opportunity for Tingo Mobile to access the U.S. public markets so he could grow the company. Mmobuosi told me he previously looked into listing the company in Nigeria or in London, but he ultimately felt that the U.S. markets were more promising.

6.      Between the summer of 2019 through the fall of 2019, I briefly served as a Board member of another company created by Mmobuosi called Tingo Mobile UK Limited, a U.K.-incorporated company. While there was some paperwork filed in relation to this company, the company never engaged in any business, and I only served on the Board for four days.

7.      In the late fall of 2019, Mmobuosi told me that in connection with his establishment of TIH, he was looking for someone to help him guide the company, establish corporate governance and financial controls, build out a Board of Directors, and assist with preparations to file a registration statement with the U.S. Securities and Exchange Commission ("SEC") in advance of a direct listing on a U.S. exchange. On October 4, 2019, a meeting was convened in London to discuss this plan. I attended this meeting as did Mmobuosi and an attorney with a specialty in SEC filings. Shortly thereafter, Mmobuosi asked me to be the Chairman of the Board of TIH, and I agreed. I assumed my official role as Chairman when TIH was incorporated in Delaware in January 2020, at which time I was the sole Board member.

8.      As Chairman of TIH, I had frequent contact with Mmobuosi regarding the business operations of TIH and Tingo Mobile. Throughout my entire tenure with TIH, Mmobuosi was my primary point of contact at TIH and Tingo Mobile and, as discussed herein,

he exercised complete and exclusive control over both entities and my oversight of both entities.

9. In connection with preparations to file a registration statement with the SEC and list on a U.S. exchange, between June 2019 and November 2020, Mmobuosi or others at Mmobuosi's direction sent me four different sets of audited financial statements for Tingo Mobile (the "Tingo Mobile Audited Financials") as follows:

   a. On June 12, 2019, Mmobuosi sent me a set of financial statements for Tingo Mobile for FY 2016, FY 2017, and FY 2018, all three of which were purportedly audited by B.M. Okebunmi, a Nigerian Chartered Accountant. DiBattista Decl. Ex. 64.

   b. On December 27, 2019, Mmobuosi sent me a different financial statement for Tingo Mobile for FY 2016, this one purportedly audited by Nominobro Ltd. *Id.* Ex. 65.

   c. On January 3, 2020, I was copied on an email containing a different set of financial statements for Tingo Mobile for FY 2017, FY 2018, FY 2019, and the three-month period ending September 30, 2019, all four of which were purportedly audited by Soloanke and Suleimanu, a Nigerian Chartered Accountant. *Id.* Ex. 66.

   d. Between August and November 2020, as part of the creation of consolidated financial statements for TIH, Mmobuosi sent me various drafts of a different set of financial statements for Tingo Mobile, all three of which were purportedly audited by a PCAOB-registered auditor in Nigeria, Olayinka Oyebola & Co ("Olayinka"). The final version was sent to me on November 4, 2020. *Id.* Ex. 69.

10. The Tingo Mobile Audited Financials provided to me by Mmobuosi within the

span of a year and a half—and sometimes sent just a few days apart—contained violently different financial metrics from each other, including wild swings between positive and negative cash balances and huge changes in reported revenues and profits.

11. The Tingo Mobile Audited Financials raised significant red flags and, as such, I repeatedly requested from Mmobuosi underlying support for the financial statements, including, as specified in examples below, the bank records of Tingo Mobile. *Id.* Ex. 43 at p. 31877 (1/2/20); p. 31878 (1/2/20); p. 31893 (1/27/20); p. 31958 (3/22/21). Notwithstanding my multiple demands, Mmobuosi outright and without any reasonable explanation repeatedly refused to provide me with the requested financial documentation, including bank statements for the relevant periods.

12. I also repeatedly requested that Mmobuosi provide me with an actual Tingo Mobile-branded phone so that I could evaluate the branding as well as the Tingo Mobile software embedded on the phone. Mmobuosi did not comply. Instead, he told me that Tingo Mobile was in the process of transitioning to new phones that had not yet arrived from China. After some time had passed, Mmobuosi told me that the company could not spare even one phone. Mmobuosi never provided me with a Tingo Mobile-branded phone.

13. I also requested Mmobuosi provide me with access to Tingo Mobile department heads in Nigeria so that I could confirm certain facts regarding the company's operations. *Id.* Exs. 49, 136. Mmobuosi denied my request and restricted my communications.

14. In September 2020, Mmobuosi did provide me with an organizational chart, however, the chart only exacerbated my concerns because it identified only four people as being affiliated with Tingo Mobile: Mmobuosi as CEO, Ayo Alao as CTO, Noel Miebi as Head of Finance and Accounts, and Auwal Tahir as COO. *Id.* Ex. 50. I asked Mmobuosi how a

company with over $500 million in revenue did not seem to have a more robust management team. I never received a reasonable response to this question. *Id.* Ex. 49.

15. On one occasion, Mmobuosi insisted that I need only review the first page of a bank statement where, according to Mmobuosi, Tingo Mobile at the time maintained its primary operating account. *Id.* Ex. 43 at p. 31877 (1/2/20). Mmobuosi provided me with the first page of the statement on January 27, 2020. The first page of the statement showed that as of January 2, 2020 Tingo Mobile purportedly had an account balance of 5,797,000,000.90 Nigerian Naira, which, at the time, would have converted to approximately $15.65 million USD. *Id.* Ex. 71.

16. In May 2020, I directly raised with Mmobuosi concerns I had regarding how preparations for the U.S. exchange listing were progressing. Mmobuosi responded that I should "let us manage [the listing] without you." *Id.* Ex. 44. Similarly, in July 2020, Mmobuosi sent me an email that stated: "I encourage you to help me keep board members away from interactions with management," and that he would "appreciate that individual [b]oard members allow management do their job." *Id.* Ex. 45.

17. On September 2, 2020, Mmobuosi sent me a draft of TIH's consolidated audited financial statements purportedly prepared by Olayinka for the first half of fiscal year 2020. The draft reported positive revenues and cash balances for TIH but also significant net losses. *Id.* Ex. 67. I raised concerns regarding these figures directly with Mmobuosi. In response, Mmobuosi told me that the financial statement had not been reviewed or authorized for release by Olayinka or TIH's CFO. *Id.* Ex. 47.

18. Fed up and trying to get answers, on September 14, 2020, I reached out directly to Olayinka and spoke with Olayinka Oyebola, the founder of the firm, via phone regarding the TIH financial statements. *See id.* Mr. Oyebola refused to provide me with any information and

told me that he needed to check with Mmobuosi before he could speak with me. The call lasted two minutes and fifty-one seconds. Within approximately 45 minutes, Mmobuosi called me with a strong reprimand. Mmobuosi admonished me for calling Mr. Oyebola which he said I was not allowed to do; all information was to come only from Mmobuosi. Mmobuosi told me that he was in control and that I was not to touch anything in Nigeria. Mmobuosi said I was obligated without question to respect his management of the company.

19. On September 16, 2020, I was forwarded an email from Mmobuosi which contained a revised version of TIH's consolidated audited financial statements accompanied by a Report of Independent Registered Public Accounting Firm signed by a representative of Olayinka (the "Olayinka TIH Statements"). *Id.* Ex. 68. Unlike the draft statement sent to me by Mmobuosi on September 2, 2020, the September 16 Olayinka TIH Statements showed a substantial net profit (i.e., an increase in profit of $271,577,839), no change in reported revenue, and $160 million less cash-on-hand. Mmobuosi did not provide me with any explanation for the radical differences in the statements produced just two weeks apart.

20. Shortly thereafter, on September 17, 2020, the then-Group CFO of TIH, who had been in the role less than three months, resigned. The CFO's resignation letter, a copy of which was sent to me as Chairman, stated that he was not given the tools and information needed to effectively discharge his duties as CFO and that he had never been paid. *Id.* Ex. 48. I understand that as of March 18, 2021, the CFO still had yet to be fully compensated. *Id.* Ex. 56.

21. On September 18, 2020, I asked Mmobuosi for an explanation regarding why the CFO had not been paid and why other bills of TIH, for which payment had been repeatedly promised, had not been paid. Mmobuosi again provided no reasonable explanation. *Id.* Ex. 49.

22. I had also frequently previously flagged my concerns regarding TIH and Tingo

Mobile's lack of liquidity with Mmobuosi because, notwithstanding the financials I had reviewed reflecting that billions of Nigerian Naira were housed in Tingo Mobile's bank account at any given time, TIH consistently struggled to pay basic and fundamental bills, such as transfer agent fees. *Id.* at Ex. 43 at p. 31908 (5/5/20); p. 31938 – 9 (9/4/20 – 9/11/20); p. 31955 (2/10/21 – 2/16/21). For example, on July 28, 2020, I reminded Mmobuosi about an outstanding April 20, 2020 transfer agent invoice and was told that all would be "sorted very shortly." *Id.* Ex. 46. I asked again on September 21, 2020 and told Mmobuosi that the transfer agent would soon terminate TIH's account. *Id.* Ex. 51. As late as March 10, 2021, the invoice had still not been paid. *Id.* Ex. 55. There were other instances of TIH and Tingo Mobile's inability to pay bills as well. For example, on July 9, 2021, I was copied on demand notice from an attorney representing the CEO of Tingo Mobile who had not been paid his salary for months. *Id.* Ex. 57.

23. At times Mmobuosi told me that the lack of available funds was driven by unfavorable foreign exchange rates but that did not seem like a reasonable explanation for why TIH and Tingo Mobile could not pay bills as low as a few hundred dollars considering the company's revenue and cash balance figures that I had reviewed in financial statements and the one bank statement cover page that Mmobuosi provided.

24. Mmobuosi ignored my requests for information needed to fulfill my remit of overseeing TIH. For example, on September 30, 2020, I asked Mmobuosi to provide: (i) job descriptions of key employees; (ii) reports from department heads; (iii) information about internal accounting processes and procedures; (iv) a list of the company's bank accounts and financial institutions; (v) a list of outside service providers. *Id.* Ex. 52. And on March 3, 2021, I asked Mmobuosi to provide: (i) a list of all Tingo Mobile bank accounts and copies of the bank statements as of December 31, 2020; (ii) a list of signatories for the Tingo Mobile bank accounts;

(iii) copies of signed engagement letters with auditors; and (iv) copies of correspondence with Nasdaq about TIH's listing application. *Id.* Ex. 54. Mmobuosi never provided this information despite multiple requests.

25. On August 27, 2020, at Mmobuosi's direction, TIH submitted a direct listing application to Nasdaq. *Id.* Ex. 41. On September 30, 2020, again at Mmobuosi's direction, TIH submitted the Olayinka TIH Statement to Nasdaq. *Id.* Ex. 53.

26. Mmobuosi continued to stress to me that all communications should be filtered through him and that he would, in turn, communicate with me and other Board members.

27. On March 22, 2021, I sent Mmobuosi a message demanding that he and Noel Miebi, Tingo Mobile's Head of Finance and Accounts, "stop playing hide and seek with the bank account information," which had been "specifically requested by the Audit Committee" and was "not an optional request." In response on that same day, Mmobuosi told me that he and Miebi would "not make banks statements available to anyone outside of Grant Thornton and Olayinka," and that the "auditors will confirm to the CFO all they have gotten from our accounts team." Mmobuosi added: "I strongly encourage you to understand that I know exactly what I'm doing here." *Id.* at p. 31958 (3/22/21).

28. In approximately January 2021, Mmobuosi told me that he had engaged Grant Thornton, a U.S.-based, PCAOB-registered, and nationally recognized accounting firm to audit TIH's consolidated financial statements and to perform the year end audit of TIH and Tingo Mobile. *Id.* at p. 31958 (3/19/21 – 3/22/21). On or about March 31, 2021, Mmobuosi provided me with a copy of a letter from Grant Thornton to Olayinka confirming that Grant Thornton was taking over the audit. *Id.* Ex. 42. Despite these representations, at no time did I ever receive any work product from Grant Thornton.

29. In approximately mid-July 2021, Mmobuosi started discussing a potential merger with a company, iWeb, Inc. ("iWeb"), that was traded over-the-counter in the U.S. but appeared to have no operating business. *Id.* Ex. 58.

30. Thereafter, Mmobuosi presented the merger to the Board as a fait accompli and instructed the Board members to sign a resolution that would cause TIH to sell Tingo Mobile— its sole asset—to iWeb. When I started asking questions and expressing concerns about the merger, including the lack of an audit of TIH by a U.S.-based PCAOB-registered accountant, Mmobuosi told me that he supports the merger, was "convinced it's what we need," and insisted that a formal Board meeting to discuss was unnecessary and would "end up being an academic exercise [a]s the required votes will be gotten." *Id.* Ex. 59.

31. I objected to the merger in the strongest of terms and Mmobuosi was not able to explain a reasonable rationale for why the proposed merger made sense. *Id.* Exs. 58–61. For example, on July 18, 2021, I objected to the transaction which in my view made no business sense for TIH. *Id.* Ex. 58.

32. On July 22, 2021 I informed Mmobuosi that the contemplated transaction would require a full board meeting. *Id.* Ex. 59. Again, on July 26, 2021, I emailed TIH Board and Mmobuosi telling them that Delaware law requires a full board meeting. *Id.* Exs. 60–61. Mmobuosi responded that he would proceed with the deal and my email "cannot, and will not stop it." *Id.* Ex. 61. Mmobuosi also told me: "it will pass," "this deal will happen," and that "there should be respect for management." *Id.* Ex. 60.

33. On July 30, 2021, I learned from a PR Newswire announcement that the merger had been approved by a majority of the Board of TIH through written consent. *Id.* Ex. 62. No full meeting of the Board occurred. *Id.* Exs. 60–61. Upon learning this news, I resigned my

position as Board Chair and ended my affiliation with TIH.  *Id.* Ex. 62.  The next day, the only other Board member to not support the proposed merger also resigned.  *Id.* Ex. 63.

34. On August 5, 2021 I specifically requested to a company lawyer that TIH's listing application be withdrawn because TIH sold its sole asset.  *Id.* Ex. 63.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15, 2023
Tannersville, New York

*Peter R. Barker*
Peter R. Barker