**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | **23 Civ. 10928 (JMF)** |
| -against- | |
| **MMOBUOSI ODOGWU BANYE (a/k/a DOZY MMOBUOSI), TINGO GROUP, INC., AGRI-FINTECH HOLDINGS, INC. (f/k/a TINGO INC.), and TINGO INTERNATIONAL HOLDINGS, INC.,** | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT</u>

David Zetlin-Jones
Michael S. DiBattista
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Ste. 20-100
New York, NY 10004
(212) 336-0978 (Zetlin-Jones)
zetlinjonesj@sec.gov

*Attorneys for Plaintiff*

July 26, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .................................................................................................................2
   I.   RELEVANT PROCEDURAL HISTORY ..........................................................2
      A.  Service of the Summons and Complaint on Defendants, and Defendants' Default. .........3
   II.  THE COMPLAINT'S UNCONTESTED ALLEGATIONS ...............................4
      A.  Mmobuosi Falsified the Business Model and Financials for Tingo Mobile and TIH........4
      B.  Mmobuosi Fraudulently Induced the Sale of Tingo Mobile from TIH to Agri-Fintech
         and then from Agri-Fintech to Tingo Group. ...................................................................5
      C.  Mmobuosi Knowingly or Recklessly Caused the Falsification of Agri-Fintech's and
         Tingo Group's Books and Records. ...................................................................................5
      D.  Mmobuosi Compounded the Fraud by Inventing Tingo Foods...........................................6
      E.  Defendants Persisted In Their Fraud Even After Its Revelation...........................................6
      F.  Defendants Have Profited from Their Fraud. ...................................................................7

ARGUMENT ......................................................................................................................8
   I.   DEFAULT JUDGMENT STANDARD ..............................................................8
   II.  DEFENDANTS ARE IN DEFAULT ................................................................9
   III. THE COMPLAINT'S WELL-PLEADED ALLEGAITONS ESTABLISH
      DEFENDANTS' LIABILITY AS TO EACH CAUSE OF ACTION ASSERTED .............9
   IV. THE COMMISSION IS ENTITLED TO THE RELIEF SOUGHT ...................10
      A. Permanent Injunctive Relief ...........................................................................................10
      B. Disgorgement and Prejudgment Interest.........................................................................11
         1.  TIH and Agri-Fintech ............................................................................................13
         2.  Mmobuosi..............................................................................................................16
      C. Civil Money Penalties......................................................................................................18
         1.  Corporate Defendants ...........................................................................................19
         2.  Mmobuosi..............................................................................................................20
      D. Mmobuosi Bar Orders......................................................................................................22
         1.  Officer and Director Bar ........................................................................................22
         2.  Penny Stock Bar.....................................................................................................23
         3.  Permanent Injunction Against the Purchase, Sale or Issuance of Securities ...............23

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Finkel v. Romanowicz*, 577 F.3d 79 (2d Cir. 2009) .......................................................................... 9

*Flores v. Boro Concrete Corp.*, 2022 WL 17551851 (S.D.N.Y. Dec. 9, 2022) ................................. 8

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155 (2d Cir. 1992) ................... 9

*In re Reserve Fund Secs. & Deriv. Litig.*, 2013 WL 5432334 (S.D.N.Y. Sept. 20, 2013) ......... 19, 20

*SEC v. Ahmed*, 72 F. 4th 379 (2d Cir. 2023) .................................................................................... 12

*SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008) ......................................................................... 23

*SEC v. Amazon Natural Treasures, Inc.*, 132 F. App'x 701 (9th Cir. 2005) .................................. 18

*SEC v. Bankosky*, 716 F.3d 45 (2d Cir. 2013) ................................................................................ 22

*SEC v. Barksdale*, No. 22-cv-1933 (LAK), ECF Dkt. No. 30 (S.D.N.Y. Mar. 15, 2023) .......... 21-22

*SEC v. Blackout Media Corp.*, 2012 WL 4051951 (S.D.N.Y. Sept. 14, 2012) ............................... 15

*SEC v. Carter*, 2023 WL 9197565 (C.D. Cal. July 14, 2023) ......................................................... 20

*SEC v. Cavanaugh*, 155 F.3d 129 (2d Cir. 1998) ........................................................................... 10

*SEC v. CKB168 Holdings, Ltd.*, 2022 WL 3347253 (E.D.N.Y. Aug. 12, 2022) ............................. 20

*SEC v. CMKM Diamonds, Inc.* 635 F. Supp. 2d 1185 (D. Nev. 2009) ........................................... 21

*SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978) ............................................ 10

*SEC v. Contorris*, 743 F.3d 296 (2d Cir. 2014) .............................................................................. 12

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ............................................... 12, 14-15

*SEC v. Forest Res. Mgmt. Corp.*, 2010 WL 2077202 (S.D.N.Y. May 18, 2010) ............................ 18

*SEC v. Gallison*, 2023 WL 8813637 (S.D.N.Y. Aug. 8, 2023) ....................................................... 20

*SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) ....................................................................................... 12

*SEC v. Gupta*, 2013 WL 3784138 (S.D.N.Y. July 17, 2013) .......................................................... 23

*SEC v. iFresh, Inc.*, 2024 WL 416709 (E.D.N.Y. Feb. 5, 2024) ............................................... 12 n.3

*SEC v. Invest Better 2001*, 2005 WL 2385452 (S.D.N.Y. May 4, 2005) ........................................ 21

*SEC v. Lorin*, 76 F.3d 458 (2d Cir. 1996) ...................................................................................... 12

*SEC v. O'Brien*, 674 F. Supp. 3d 85 (S.D.N.Y. 2023) .................................................................... 21

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ...................................................................................... 22

*SEC v. Rinfret*, 2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020) ....................................................... 8, 9

*SEC v. Sanchez*, 2022 WL 1036792 (S.D.N.Y. Apr. 6, 2022) ........................................................ 22

*SEC v. Save the World Air, Inc.*, 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005) ............................ 15

*SEC v. Simmons*, 22-cv-07081 (JSR), ECF Dkt. No. 46 (S.D.N.Y. June 28, 2023) ...................... 24

*SEC v. Ten Cate*, 22-cv-2787 (PKC), ECF Dkt. No. 19 (S.D.N.Y. Jan. 3, 2023) .......................... 24

*SEC v. Terraform Labs Pte Ltd.*, 23-cv-01346 (JSR), ECF Dkt. No. 273 (S.D.N.Y. June 12, 2024) ...... 24

*SEC v. Tourre*, 4 F. Supp. 3d 579 (S.D.N.Y. 2014) ....................................................................... 19

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ...................................................................... 10

*SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) .............................................. 23

*SEC v. Vuuzle Media Corp.*, 2023 WL 4118438 (D.N.J. June 22, 2023) ....................................... 21

*TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd.*, 536 Fed. Appx. 45 (2d Cir. 2013) ....................... 10


**Rules**

Federal Rule of Civil Procedure 55 ..................................................................................................... 9


**SEC Published Notices**

89 Fed. Reg. 1970 (Jan. 11, 2024) ..................................................................................................... 18


**Statutes**

Exchange Act Section 20(a), 15 U.S.C. § 78t(a) ............................................................................... 14

Exchange Act Section 21(d), 15 U.S.C. § 78u(d) ............................................................. 11, 12, 17-18, 22, 23

Exchange Act Section 21A(a), 15 U.S.C. § 78u-1(a) ........................................................................ 18

Securities Act Section 20(b), 15 U.S.C. § 77t(b) ..................................................................... 23

Securities Act Section 20(d), 15 U.S.C. § 77t(d) ..................................................................... 18

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its application for default judgment against Defendants Tingo International Holdings, Inc. ("TIH"), Agri-Fintech Holdings, Inc. (f/k/a Tingo, Inc.) ("Agri-Fintech"), Tingo Group, Inc. ("Tingo Group"), and Mmobuosi Odogwu Banye, a/k/a Dozy Mmobuosi ("Mmobuosi") (collectively "Defendants") under Federal Rule of Civil Procedure 55(b)(2) and Rule 55.2(b) of the Local Rules of the United States District Courts for the Southern and Eastern District of New York based on Defendants' failure to answer or otherwise respond to the Commission's Complaint.

## PRELIMINARY STATEMENT

Beginning in at least 2019, Defendants TIH, Agri-Fintech, and Tingo Group (collectively, the "Corporate Defendants"), led by their controlling shareholder and CEO, Defendant Mmobuosi, have held themselves out as profitable, emerging tech companies focused on improving the livelihood of African farmers.  Mmobuosi and the Corporate Defendants—one private, one traded OTC, and one listed on the Nasdaq stock exchange—consistently reported strong financials, made public statements about record growth, and targeted U.S. retail and institutional investors.  But the success story painted by Defendants was an elaborate lie designed to benefit Mmobuosi and the companies he controlled at the expense of innocent investors—a lie Mmobuosi concealed through falsified financial statements, forged bank records, and knowingly false representations, all designed to deceive the Corporate Defendants' Boards of Directors, merger counterparties, auditors, and investors.  This massive fraudulent scheme orchestrated by Mmobuosi generated significant pecuniary gain and reputational benefits for Defendants but caused substantial harm to investors.

On the basis of this misconduct, the Commission sued Defendants, and Defendants have failed to answer the charges or otherwise defend this action, despite proper service and their demonstrated awareness of the litigation.  Consequently, pursuant to Federal Rule of Civil

Procedure 55(b)(2), the Commission respectfully moves for the entry of default judgments against Defendants, and requests the following relief for the benefit and protection of investors: (i) a permanent injunction enjoining Defendants from future violations of the securities laws they are alleged to have violated; (ii) an order that defendants TIH, Agri-Fintech, and Mmobuosi disgorge their ill-gotten gains plus prejudgment interest on those amounts; (iii) an order that Defendants pay civil money penalties; and (iv) an order imposing penny stock and officer and director bars against Mmobuosi, and an order permanently enjoining Mmobuosi from participating in the issuance, purchase or sale—or engaging in activities for the purpose of inducing or attempting to induce the purchase or sale—of a security.

## BACKGROUND

### I.    RELEVANT PROCEDURAL HISTORY

On December 18, 2023, the Commission filed its Complaint against Defendant Mmobuosi and three corporate entities he controls, TIH, Agri-Fintech, and Tingo Group, alleging numerous primary and (as to Mmobuosi) secondary violations of the anti-fraud, record-keeping, and accounting controls provisions of the federal securities laws, among others.  DiBattista Decl. Ex. 1; Dkt. 1.[1]  The same day, the Commission filed an emergency application seeking a temporary restraining order and other equitable relief, as well as an order to show cause why a preliminary injunction should not be granted.  Dkt. 5.  Following a hearing that afternoon, the Court granted the Commission's emergency application and entered the requested temporary restraining order.  Dkt. 14.

---

[1] This Memorandum of Law refers to entries on the Court's docket as "Dkt. __." Citations to "Mele Decl. ¶ __" and "DiBattista Decl. ¶ __," refer to the accompanying declarations of Christopher Mele and Michael DiBattista, respectively. Citations to "Compl. ¶ __" refer to the Complaint.

On March 11, 2024, after Defendants failed to respond to an order to show cause why the temporary restraining order should not be converted to a preliminary injunction, despite many extensions of their time to do so, the Court converted the temporary restraining order to a preliminary injunction, finding that the Commission's unopposed emergency application made a showing sufficient to warrant imposition of that relief.  Dkt. 45.  In the interim, on January 2, 2024, the United States Attorney's Office for the Southern District of New York unsealed criminal charges against Mmobuosi arising out of certain of the conduct alleged herein.  DiBattista Decl. ¶ 28, Ex. 19.  Mmobuosi has not appeared in the parallel criminal action and remains a fugitive.  *See id.*

### A.    Service of the Summons and Complaint on Defendants, and Defendants' Default.

Agri-Fintech and Tingo Group returned executed waivers of service of the Summons and Complaint on January 18 and January 25, 2024, respectively, proof of which was filed with the Court on January 25, 2024.  *Id.* ¶ 9, Exs. 4–5; Dkts. 34–35.  The deadline for each of these defendants to respond to the Complaint was initially set for March 18, 2024.  DiBattista Decl. ¶ 10.  At these defendants' request, the deadline was later extended to, and expired on, April 17, 2024.  *Id.*

The Commission effected service of the Summons and Complaint on TIH on January 30, 2024, and filed proof of service with the Court on February 5, 2024.  *Id.* ¶¶ 11–14, Exs. 6–9; Dkt. 37.  The deadline for TIH to answer or otherwise respond to the Complaint expired on February 20, 2024.  DiBattista Decl. ¶ 15.

On May 21, 2024, the Court entered an order authorizing the Commission to serve the Summons and Complaint on Defendant Mmobuosi by alternative means pursuant to Federal Rule of Civil Procedure 4(f)(3).  *Id.* ¶ 16; Dkt. 55.  On May 22, 2024, the Commission effected service of the Summons and Complaint on Mmobuosi through the means authorized by the Court's Order, as reflected in the proof of service filed with the Court on May 24, 2024.  DiBattista Decl. ¶¶ 17–18,

Exs. 10–12; Dkts. 56–58.  The deadline for Mmobuosi to answer or otherwise respond to the

Complaint expired on June 12, 2024.  DiBattista Decl. ¶ 19.

As none of the Defendants answered or otherwise responded to the Complaint by their

deadlines, the Clerk of the Court entered a Certificate of Default as to all Defendants on June 18,

2024.  *Id.* ¶¶ 20, 22, Ex. 14; Dkt. 64.

## II.    THE COMPLAINT'S UNCONTESTED ALLEGATIONS

As alleged, Mmobuosi orchestrated a scheme to cause the Corporate Defendants he

controlled to deliberately and massively overstate their reported financial results in their SEC filings,

public statements, and books and records over the course of several years.  Compl. ¶ 1.

### A.    Mmobuosi Falsified the Business Model and Financials for Tingo Mobile and TIH.

The fraud's roots date back years, and pertain mainly to Tingo Mobile, PLC ("Tingo

Mobile"), a private Nigerian telecommunications company that Mmobuosi founded in 2001.

Compl. ¶ 1.  Beginning at least as of 2019, Mmobuosi created fake financial statements and forged

supporting material to falsely portray Tingo Mobile as a thriving and profitable enterprise, with

hundreds of millions of dollars in annual revenues, profits, and available cash and a subscriber base

of millions of farmers using its phones and services.  *Id.*  In reality, the company had no meaningful

operations or customers and, as of 2019, about $15 in its bank account.  *Id.*

Mmobuosi weaved this tale with an eye towards accessing the U.S. capital markets and

duping U.S. investors to buy into his company's fictitious success.  Toward that end, he restructured

his private company to put it under the ownership of TIH, a U.S.-based holding company he

established and controlled, and, in or around September 2020, pursued a direct listing for TIH on a

major U.S. stock exchange.  *Id.* ¶¶ 29–32.  As detailed in the Complaint, in the course of preparing

for this listing, he took various steps to conceal his fraud from TIH's Board of Directors and

independent management—including sending them false financial statements and forged bank

statements and restricting their access to information and data necessary for basic corporate oversight functions.  *Id.* ¶¶ 42–74.

**B.    Mmobuosi Fraudulently Induced the Sale of Tingo Mobile from TIH to Agri-Fintech and then from Agri-Fintech to Tingo Group.**

After TIH abandoned its direct listing efforts, Mmobuosi pursued an alternative course: achieving a listing for Tingo Mobile through reverse mergers with already-public companies. Mmobuosi orchestrated the successive acquisitions of Tingo Mobile by two publicly-traded U.S. companies: (i) first selling Tingo Mobile from TIH to OTC-traded Agri-Fintech in August 2021; and (ii) then, after becoming the controlling shareholder and CEO of Agri-Fintech, selling it again in December 2022 from Agri-Fintech to Nasdaq-listed Tingo Group.  Compl. ¶¶ 4, 33–37, 76–80. Each merger assigned a reported value to Tingo Mobile in the billions of dollars—valuations supported purely by the fabricated financial statements Mmobuosi concocted and the sham operational success they purported to depict.  *See id.*  Through these mergers, Mmobuosi assumed control of two publicly-traded U.S. corporations, obtaining for himself hundreds of millions of shares in the newly merged companies, as well as access to a public market for their disposal. *See id.*

**C.    Mmobuosi Knowingly or Recklessly Caused the Falsification of Agri-Fintech's and Tingo Group's Books and Records.**

Mmobuosi used these public companies as a vehicle to further his fraudulent misconduct. After taking the helm of Agri-Fintech and Tingo Group, Mmobuosi knowingly, or with reckless disregard, caused Tingo Mobile's fictitious transactions to be recorded in those companies' books and records and reported in their SEC filings, press releases, investor presentations, and other public disclosures, many of which Mmobuosi directly made and/or certified.  Compl. ¶¶ 120–140.  As a result, Agri-Fintech and Tingo Group materially overstated their reported sales, earnings, and assets in their publicly-disclosed financial statements for each reporting period in which each owned Tingo Mobile as its principal operating subsidiary.  *See id.*  These material misstatements created the false

impression that Tingo Mobile was a thriving, multimillion-dollar business when in fact its operations and earnings were fabricated—artificially propping up the price of their shares and Mmobuosi's controlling stake in them. *See id.*

Defendants sustained their fraud through their systematic circumvention of company accounting and governance controls, as well as widespread deception of company auditors. Under Mmobuosi's control, the Corporate Defendants provided their auditors and others a raft of fake bank statements, falsified general ledgers, and other forged and doctored invoices, contracts, and records to support their fabricated financial results—even resorting to impersonating their fictitious customers and suppliers through fake email addresses to dupe auditors into believing that these made-up business partners existed when they did not. Compl. ¶¶ 81–119, 141–42.

### D.    Mmobuosi Compounded the Fraud by Inventing Tingo Foods.

In early 2023, Mmobuosi replicated the Tingo Mobile fraudulent scheme with a new entity, Tingo Foods PLC ("Tingo Foods"), a purported food processor. Compl. ¶¶ 112–119. As with Tingo Mobile, Mmobuosi contrived Tingo Foods from whole cloth—concocting a fictitious business model predicated on non-existent customers and backed by forged financial and bank statements and other falsified documents. *Id.* ¶¶ 114–119. In February 2023, Mmobuosi sold Tingo Foods to Tingo Group in exchange for a $204 million promissory note with a two-year term carrying a 5% interest rate. Tingo Group thereafter incorporated and reported Tingo Foods' fabricated financial results, in addition to Tingo Mobile's, compounding the fraud. *See id.* ¶ 113.

### E.    Defendants Persisted In Their Fraud Even After Its Revelation.

Defendants' fraud was partially exposed on June 6, 2023 by the publication of a report by a research analyst firm, which stated that Tingo Group was "an exceptionally obvious scam with completely fabricated financials." Compl. ¶ 143. Agri-Fintech's and Tingo Group's share prices dropped 81% and 48% respectively on the report's publication. *Id.* ¶¶ 144–145.

In response, Defendants issued a series of public denials, insisting defiantly, and contrary to reality, that Tingo Mobile's and Tingo Foods' nonexistent businesses and fabricated revenues were legitimate. *Id.* ¶¶ 148–150. Defendants persisted in their false denials—and continued to prepare and file false financial statements, and publicly issue press releases attesting to the accuracy of Tingo Mobile's and Tingo Foods' knowingly false financial results—even after the Commission temporarily suspended trading in Agri-Fintech and Tingo Group stock citing "questions and concerns regarding the accuracy" of public information concerning the two entities. *Id.* ¶¶ 155–156.

### F.    Defendants Have Profited from Their Fraud.

Defendants have reaped substantial benefits from their fraudulent misconduct. As detailed more fully below, by crafting the false narrative of Tingo Mobile's and Tingo Foods' success, Mmobuosi caused (i) TIH, a company he controlled, to sell Tingo Mobile to Agri-Fintech through an all-stock merger in August 2021, yielding a benefit of nearly a billion shares of OTC-listed stock; (ii) Agri-Fintech, a company he controlled, to sell Tingo Mobile to Tingo Group through an all-stock merger in December 2022, yielding millions more shares of stock listed on a major U.S. exchange; and (iii) Tingo Group to acquire Tingo Foods from Mmobuosi personally in February 2023 for a promissory note of more than $200 million. Compl. ¶¶ 160. Mmobuosi sold millions of his Agri-Fintech shares while in possession of the material, nonpublic information that Agri-Fintech's publicly-reported financial information incorporated falsified records and fictitious transactions and were thus overstated. *Id.* ¶¶ 161–64. TIH and Agri-Fintech have realized substantial benefits from the fraud as well, by transferring shares to third parties in exchange for goods, services, and other direct benefits. *See id.* And these defendants remain in possession of millions more shares that they fraudulently obtained. *Id.* ¶ 163. Mmobuosi has also abused his control status to loot Tingo Group assets, misappropriating over $25 million from the company to fund lavish personal extravagances. *Id.* ¶¶ 166–169.

## ARGUMENT

For the following reasons, the Court should enter a default judgment against Defendants enjoining them from future violations of the federal securities laws they are alleged to have violated, ordering Mmobuosi, TIH and Agri-Fintech to disgorge their ill-gotten gains and prejudgment interest thereon, ordering all Defendants to pay civil money penalties, and imposing permanent penny stock and officer and director bars against Mmobuosi, as well as a bar against Mmobuosi prohibiting him from participating in the issuance, purchase or sale—or engaging in activities for the purpose of inducing or attempting to induce the purchase or sale—of a security.

## I.    DEFAULT JUDGMENT STANDARD

"Federal Rule of Civil Procedure 55 sets out a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of default and the entry of a default judgment." *SEC v. Rinfret*, No. 19 Civ. 6037 (AJN), 2020 WL 6559411, at *2 (S.D.N.Y. Nov. 9, 2020). "The first step, entry of a default, simply formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.* (internal quotations omitted). "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by the pleadings." *Id.* (internal quotation marks and citations omitted).

"Whether entry of default judgment at the second step is appropriate depends on whether the allegations against the defaulting party are well pleaded." *Id.* at *3. Default is appropriate where a Complaint's allegations sufficiently plead Defendants' liability as to each cause of action asserted. *See Flores v. Boro Concrete Corp.*, No. 21-CV-5006 (JMF), 2022 WL 17551851, at *3 (S.D.N.Y. Dec. 9, 2022). In assessing the legal sufficiency of the Complaint on a motion for default judgment, the Court must accept as true the Complaint's factual allegations and draw all reasonable inferences in

the plaintiff's favor. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009); *see also Rinfret,* 2020 WL 6559411, at *3 ("The legal sufficiency of these claims is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the movant's favor.").

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155 (2d Cir. 1992). Thus, in evaluating the propriety of the relief sought through this motion, the Court may consider, in addition to the Complaint's well pleaded allegations, the affidavits and documentary evidence proffered in support of its requested relief. *See Rinfret*, 2020 WL 6559411, at *3. A hearing is allowed, but not required, provided the submitted proof substantiates the sufficiency and extent of plaintiff's damages claims with reasonable certainty. *Id.* (collecting cases).

## II.    DEFENDANTS ARE IN DEFAULT

As detailed above, the Commission properly carried out service on all Defendants of the Summons and the Complaint under Rule 4 of the Federal Rules of Civil Procedure. As the Clerk of the Court has certified, none of the Defendants have answered or otherwise responded to the Complaint within the time limit established by Federal Rule of Civil Procedure 12(a)(1). DiBattista Decl. ¶¶ 10, 15, 19–20, 22, Ex. 14; Dkt. 64. Thus, Defendants are now in default. *See* Fed. R. Civ. P. 55(a).

## III.    THE COMPLAINT'S WELL-PLEADED ALLEGAITONS ESTABLISH DEFENDANTS' LIABILITY AS TO EACH CAUSE OF ACTION ASSERTED

The Complaint's factual allegations, summarized above, amply establish Defendants' liability as to each cause of action asserted. This Court has already preliminarily enjoined Defendants from future violations of the securities laws the Complaint alleges them to have violated. Dkt. 45. In considering the Commission's request for a preliminary injunction, the Court evaluated not merely

the Commission's Complaint (accepted as true and read in the light most favorable to the plaintiff),
but also voluminous evidentiary support and a detailed briefing that explained how the underlying
allegations and evidence satisfied each element of every charge asserted. *See* Dkts. 7–11, 13–17. On
the basis of that record, the Court determined that the Commission had established a "substantial
showing" of its likelihood of success on the merits, a standard of review more demanding than the
plausibility standard applicable to the instant motion. *Compare SEC v. Unifund SAL*, 910 F.2d 1028,
1039 (2d Cir. 1990) (a motion for preliminary relief requires a "substantial showing of likelihood of
success"), *with TAGC Mgmt., LLC v. Lehman, Lee & Xu Ltd.*, 536 Fed. Appx. 45, 47 (2d Cir. 2013)
(analyzing default motion under *Twombly/Iqbal* plausibility standard).

For the same reasons and on the same bases that the Court previously determined that the
Commission has made a substantial showing of its likelihood of success on the merits of its claims,
the Commission's Complaint and the record currently before the Court sufficiently establish a prima
facie case as to each of the charged counts. *See* Dkt. 7 (Plaintiff's Memorandum of Law in Support
of its Emergency Application) at pp. 25–44.

## IV.    THE COMMISSION IS ENTITLED TO THE RELIEF SOUGHT

### A.    Permanent Injunctive Relief.

Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act 21(d)(1) [15 U.S.C.
§ 78u(d)(1)] authorize the Commission to seek injunctive relief upon a showing that (1) violations of
the securities laws have occurred, and (2) there is a reasonable likelihood that violations will occur in
the future. *See SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978). In
determining whether there is a reasonable likelihood of future violations, courts generally consider:
(1) the egregiousness of the conduct; (2) the isolated or recurrent nature of the infraction; (3) the
degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations;

and (5) the defendant's recognition of the wrongful nature of his conduct.  *See SEC v. Cavanaugh*, 155

F.3d 129, 135 (2d Cir. 1998).

Permanent injunctions against each Defendant enjoining them from violating the provisions

of the securities laws they are charged with having violated are warranted.  *First*, the magnitude and

brazenness of the scheme were egregious.  Defendants invented an entire (and fictious) corporate

ecosystem, fabricating from thin air billions of dollars of purchases and sales of fictitious phones and

food crops from customers and suppliers that do not exist.  Compl. ¶¶ 2, 41–54, 60–66, 81–119.

Defendants compounded this misconduct through the manufacture of forged and falsified

documents to conceal their lies—even resorting to impersonating their supposed customers—and

routinely filed false public statements that disguised their fraud and painted a falsely positive picture

of the Corporate Defendants' financial condition—all of which demonstrates their high degree of

scienter.  *Id.* ¶¶ 2–6, 41–54, 60–66, 81–140.  *Second*, Defendants' misconduct was not an isolated

incident, but was carried out continuously over the course of at least five years and across three

corporate entities, magnifying in scope over time.  *Finally*, none of the Defendants have

acknowledged the wrongful nature of their conduct or provided any assurance against future

violations.  To the contrary, Defendants have failed to appear here to answer for their illegal acts,

continued to defend their conduct and promote the fraud after the publication of the analyst report,

and Mmobuosi has continued to make public statements denying the charges after the initiation of

this litigation.  *Id.* ¶¶ 146–159; DiBattista Decl. ¶¶ 5–8, Exs. 2–3.  Permanent injunctions prohibiting

future violations of the charged securities laws are therefore warranted against each Defendant.

**B.    Disgorgement and Prejudgment Interest.**[2]

Exchange Act Sections 21(d)(3), (5), and (7) [15 U.S.C. §§ 78u(d)(3), (5), (7)] authorize district courts to order disgorgement as a remedy to securities law violations to "deprive violators of their ill-gotten gains." *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The disgorgement remedy is applicable to "any unjust enrichment" received by a violator of the securities laws. 15 U.S.C. § 78u(d)(3)(A)(ii). District courts have "wide latitude" and discretion in ordering and calculating disgorgement. *See SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). Disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Ahmed*, 72 F. 4th 379, 397 (2d Cir. 2023) (internal quotation marks and citation omitted). Once the Commission establishes this reasonable approximation, the burden shifts to the defendant to prove a more reasonable figure. *See Lorin*, 76 F.3d at 462. "Where disgorgement calculations cannot be exact, any risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (internal quotation marks and citation omitted). The Second Circuit has recently held that a district court at the remedial phase of a Commission action abused its discretion when it ordered disgorgement without finding that the victims suffered pecuniary harm. *SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023).[3] In so doing, the Second Circuit confirmed, however, that "disgorgement is 'measured by' the wrongful gain obtained by the defendant rather than by the loss to the investor." *Id.* at 105.

District courts also have authority to order prejudgment interest on the principal amount to be disgorged "to deprive the wrongdoer of the benefit of holding the illicit gains over time by

---

[2] The Commission is not seeking disgorgement from Tingo Group because there is insufficient evidence that Tingo Group exploited its inflated stock value through any capital raises or securities offerings, and what benefits it did reap from the scheme (through transfers of its shares at inflated values for services rendered) may have been offset by its losses resulting from, among other things, Mmobuosi's misappropriation of its assets.

[3] There is no question that victims of the fraud suffered significant pecuniary harm here. Agri-Fintech's and Tingo Group's share prices fell 81% and 48% respectively upon publication of the research analyst report partially exposing the

reasonably approximating the cost of borrowing such gain from the government." *SEC v. Contornis*, 743 F.3d 296, 308 (2d Cir. 2014). Courts typically apply the IRS underpayment rate to the amount to be disgorged. *See First Jersey Secs.*, 101 F.3d at 1476 (applying that rate).

In support of the Commission's request for disgorgement and prejudgment interest, the Commission has submitted the Declaration of Christopher Mele, a staff accountant employed by the Commission and assigned to the investigation preceding this litigation. As described in his declaration, Mr. Mele reviewed documents produced to the Commission during the investigation by various parties, including the Defendants, as well as periodic filings filed with the Commission by the Corporate Defendants, and other materials bearing on the ill-gotten gains Defendants procured through their fraud. The Commission submits, respectfully, that the accompanying declaration and documentary evidence appended thereto sufficiently support the extent of the monetary relief sought with reasonable certainty to obviate the need for a hearing.

### 1. TIH and Agri-Fintech

Both TIH and Agri-Fintech profited from the scheme in much the same way. Each of these defendants owned Tingo Mobile for a period of time. Compl. ¶ 37. During those periods, each fraudulently portrayed Tingo Mobile as a wildly successful enterprise when it was not. *Id.* ¶¶ 4, 60–74, 120–133. And each parlayed that false portrait to extract vastly inflated values in their respective fraudulent sale of Tingo Mobile. In August 2021, TIH induced Agri-Fintech to part with nearly a billion shares of its stock in exchange for Tingo Mobile through these false pretenses. *Id.* ¶¶ 4, 33–34, 76. Agri-Fintech, in turn, used those same false pretenses to induce Tingo Group to part with

---

fraud and collapsed virtually entirely following the filing of this action exposing fully the fraud and its extent. Mele Decl. ¶¶ 58–62. This establishes pecuniary harm. *See SEC v. iFresh, Inc.,* No. 22 civ. 3200 (ARR/SJB), 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024) (Artificial inflation of stock prices while the fraud was ongoing was sufficient to "establish[] the requisite pecuniary harm to those who purchased iFresh stock during that time period.").

millions of shares of its stock.  *Id.* ¶¶ 4, 35–36, 165.  These shares, secured through these defendants' fraud, represent their ill-gotten gains from the scheme.

As reflected in the Mele Declaration, transfer agent records and public filings indicate that both TIH and Agri-Fintech realized concrete, quantifiable benefits from their fraud by transferring their fraudulently procured shares to third parties in lieu of cash in exchange for goods, services, and other benefits. Mele Decl. ¶¶ 7–10, 12–14.[4]  As such, the Commission is entitled to disgorgement of the value of the shares that TIH and Agri-Fintech transferred to others for their direct benefit, which constitute ill-gotten proceeds obtained through TIH's and Agri-Fintech's fraud.  As to TIH, that amounts to $156,672,705.86, which reflects the value of the 81,971,827 shares of fraudulently obtained Agri-Fintech common stock that it has transferred in exchange for goods, services, and other benefits as of the time of the transfers.  *Id.* ¶ 10.[5]  As to Agri-Fintech, that amounts to $12,164,000.00, which represents the value of the 13,400,000 shares of fraudulently obtained Tingo Group common stock that it has transferred in exchange for goods, services, and other benefits as of the time of the transfers.  *Id.* ¶ 14.

The Commission also respectfully requests that the Court award it prejudgment interest compounded at the IRS underpayment rate, which, running from the date of the last share transfer, the Commission has calculated as $20,193,871.58 for TIH and $574,682.90 for Agri-Fintech (*Id.* ¶¶ 56–57), resulting in a calculation of total disgorgement and prejudgment interest thereon as to these defendants as follows:

---

[4] For instance, Forms 4 and transfer agent records show that on April 12, 2022, TIH transferred 20 million shares of its Agri-Fintech stock to employees and consultants for unspecified services rendered.  Mele Decl. Ex. A.  Forms 4 and transfer agent records show that Agri-Fintech pledged 2 million shares of its Tingo Group stock as collateral for a short-term loan, and that it transferred those shares to the lender upon its default in November 2023.  *Id.* Ex. C.

[5] This figure excludes transfers made by TIH to Mmobuosi (addressed below in connection with the discussion of Mmobuosi's disgorgement) and transfers made to all TIH shareholders as in-kind distributions.

| Defendant | Disgorgement Amount | Prejudgment Interest | Total |
|-----------|---------------------|----------------------|-------|
| TIH | $156,672,705.86 | $20,193,871.58 | $176,866,577.44 |
| Agri-Fintech | $12,164,000 | $574,682.90 | $12,738,682.90 |

Mmobuosi should be ordered joint and severally liable for these amounts as a control person of TIH and Agri-Fintech.  *See* 15 U.S.C. § 78t(a).  The Complaint amply alleges Mmobuosi's status as a control person of these entities: as their CEO and principal shareholder, he possessed the authority to direct their affairs and was a culpable participant in—indeed the principal mastermind of—their frauds.  *See* Compl. ¶¶ 223–227.  Joint and several liability is therefore appropriate.  *See First Jersey Secs.*, 101 F.3d at 1475–76 (affirming district court order holding CEO jointly and severally liable for corporation's disgorgement and prejudgment interest because the firm "received gains through unlawful conduct" and "its owner and chief executive officer ha[d] collaborated in that conduct and has profited from the violations").

In addition, TIH and Agri-Fintech remain in possession of hundreds of millions of shares of stock they fraudulently obtained, which retain some marginal pecuniary value and profit potential.  Mele Decl. ¶¶ 11, 15.  To assure these defendants are fully deprived of the ill-gotten fruits of their fraud, the Commission requests that the Court order TIH and Agri-Fintech to disgorge their remaining shares of Agri-Fintech and Tingo Group stock that they obtained as consideration for the sale of Tingo Mobile.  Ordering defendants to surrender for cancellation stock obtained through fraud pursuant to a disgorgement order for violating the securities laws is within the discretion of the Court.  *See, e.g., SEC v. Blackout Media Corp.*, No. 09 Civ. 5454 (GBD), 2012 WL 4051951, at *2 (S.D.N.Y. Sept. 14, 2012) ("Cancellation of stock is an equitable action that courts have used against serious and serial violators of the securities laws.") (internal citations omitted); *SEC v. Save the World Air, Inc.*, No. 01 Civ. 11586 (GBD) (FM), 2005 WL 3077514, at *20 (S.D.N.Y. Nov. 15, 2005) (ordering disgorgement and cancellation of defendant's shares received through fraudulent scheme).

Requiring TIH and Agri-Fintech to disgorge its remaining shares of Agri-Fintech and Tingo

Group stock is particularly appropriate here to ensure that the companies—and Mmobuosi as each's principal shareholder—cannot profit from their fraud.  Moreover, the cancellation of TIH's Agri-Fintech shares and Agri-Fintech's Tingo Group shares will inure to the benefit of innocent Agri-Fintech and Tingo Group shareholders who were victimized by the fraud (by reducing the number of shares in these companies issued and outstanding), serving the investor protection purpose of the disgorgement remedy. *See Save the World Air, Inc.*, 2005 WL 3077514, at \*20.

### 2.  **Mmobuosi**[6]

Mmobuosi reaped substantial profits from the fraudulent scheme he orchestrated separate from (and beyond) the Corporate Defendants' ill-gotten gains for which he is jointly and severally liable.  These fraudulently obtained proceeds, described below, are also appropriately subject to disgorgement and prejudgment interest.

*First*, as detailed in the Mele Declaration, Mmobuosi personally obtained over 200 million shares of Agri-Fintech stock through his scheme: (i) he received 61 million shares of Agri-Fintech Class B common stock in connection with TIH's fraudulent sale of Tingo Mobile to Agri-Fintech in August 2021; (ii) he later used his control of TIH to cause it to transfer 138,309,577 shares of Agri-Fintech Class A common stock that TIH obtained in that fraudulent transaction to him personally; and (iii) he was awarded another 10 million shares of Agri-Fintech Class A common stock under Agri-Fintech's equity incentive plan.  Mele Decl. ¶ 16.

Between May and June 2023, Mmobuosi realized a net profit of $2,138,038.14 from undisclosed and illegal insider sales of 10 million of these shares, which he should have to disgorge. *See* Compl. ¶¶ 161–62; Mele Decl. ¶¶ 17–19, Ex. E.  Mmobuosi also remains in possession of over 100 million shares of Agri-Fintech stock, which the Commission requests he be ordered to

---

[6]  The Commission is not seeking relief under Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243] against Mmobuosi because such relief would be duplicative of the disgorgement sought.

surrender for cancellation for the same reasons TIH and Agri-Fintech should be ordered to surrender their shares.  *See supra* pp.15–16; *see also* Mele Decl. ¶ 20.

 *Second*, as described in the Complaint and the Mele Declaration, Mmobuosi also exploited his control status to loot Tingo Group assets for his personal gain.  Compl. ¶¶ 166–169; Mele Decl. ¶¶ 22–53.  Mmobuosi misappropriated millions of dollars from Tingo Group's accounts by representing falsely that the funds were needed for legitimate corporate purposes when, in fact, he intended to (and did) embezzle them to finance personal indulgences.  For example, on December 21, 2022, shortly after Mmobuosi fraudulently induced its purchase of Tingo Mobile, Tingo Group authorized the transfer of $10 million to Tingo Mobile to buy phones from a supplier.  Mele Decl. ¶ 41, Ex. K.  These funds were not used for their stated purpose (indeed, Tingo Mobile never obtained any phones from this supplier).  Compl. ¶ 168; Mele Decl. ¶¶ 42–43, n.4.  Rather, Mmobuosi caused the funds to be transferred first to an attorney trust account in the name of Agri-Fintech's General Counsel and Tingo Group's current CEO, and then arranged for $9.5 million of those funds to be transferred to his personal account.  Mele Decl. ¶ 42.  The very next day, Mmobuosi used those funds to transfer £6.5 million GBP (around $7.83 million USD) as partial payment for his ultimately unsuccessful bid to acquire a professional English Premiere League soccer team.  *Id.* ¶ 43.  Mmobuosi netted $25,494,589.79 through this and similar instances of his diversion of corporate funds from Tingo Group's accounts to pay for his personal expenses.  *Id.* ¶¶ 29–53.  These defalcations, which result directly from his fraud, should be subject to disgorgement.

 The Commission also requests that the Court order prejudgment interest on the total monies sought from Mmobuosi as disgorgement ($27,632,627.93, the sum of these misappropriated funds plus proceeds from his insider sales), which equates to $2,032,811.14.  *Id.* ¶ 58.

 *Third*, Mmobuosi replicated the Tingo Mobile fraud when he sold Tingo Foods to Tingo

Group based on fraudulent financial information.  In consideration for the sale of Tingo Foods, Mmobuosi obtained a promissory note from Tingo Group, requiring the latter to pay Mmobuosi $204 million plus 5% interest on or before February 9, 2025.  Compl. ¶ 113; Mele Decl. ¶ 64, Ex. S. If Mmobuosi were allowed to retain and collect on the promissory note, he would stand to receive hundreds of millions of dollars as a reward for his fraud.  Accordingly, the Commission requests that the Court require Mmobuosi to disgorge (*i.e.*, cancel) the ill-gotten promissory note.  This remedy is authorized under Sections 21(d)(3) and (d)(7) of the Exchange Act, which authorize disgorgement "of any unjust enrichment by the person who received such unjust enrichment as a result of" a violation of the securities laws, and it adheres to precedent.  *See SEC v. Amazon Natural Treasures, Inc.*, 132 F. App'x 701, 703 (9th Cir. 2005) ("The district court . . . ordered [defendant] to disgorge a total of $232,322, plus all promissory notes inuring to his benefit. . . . [W]e find that the district court did not abuse its discretion by . . . ordering [the defendant] to disgorge his gains and promissory notes. . . .").

### C.    Civil Money Penalties.

"[B]ecause disgorgement represents merely a return of ill-gotten gains," courts recognize that "an additional monetary penalty is necessary to appropriately punish and deter . . . fraudulent activities."  *SEC v. Forest Res. Mgmt. Corp.*, No. 09 Civ. 0903 (JSR), 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010).  Securities Act Section 20(d) [15 U.S.C. § 77t(d)(2)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)(B)] authorize the Court to order civil money penalties for violating the acts.  The amount of penalty is to be determined "in light of the facts and circumstances" based on a three-tiered penalty scheme.  *See* 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B).  The highest tier of penalties—the third tier—is appropriate for violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and which "directly or indirectly result[] in substantial losses or create[] a significant risk of substantial

losses to other persons." *Id.* Third tier penalties shall not exceed the greater of (i) the gross amount

of pecuniary gain to the defendant; or (ii) $230,464.00 for natural persons or $1,152,314.00 for

entities (adjusted for inflation) multiplied on a per-violation basis. *See id.*; 89 Fed. Reg. 1970, 1971

(Jan. 11, 2024). In addition, Exchange Act Section 21A(a)(2) allows for higher penalties for

violations involving insider trading, authorizing up to "three times the profit gained or loss avoided

as a result of such unlawful purchase, sale, or communication." 15 U.S.C. § 78u-1(a)(2).

In determining whether penalties should be imposed and in what amount, courts typically

consider: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's

scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial

losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and

(5) whether the penalty should be reduced due to the defendant's demonstrated current and future

financial condition." *SEC v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014). Courts also have wide

discretion in calculating the number of "violations" when fashioning a penalty on a per-violation

basis because the statutory penalty provisions do not define the term "violation." *In re Reserve Fund*

*Secs. & Deriv. Litig.*, No. 09-CV-4346 (PGG), 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 20, 2013).

The Commission submits that a maximum Tier 3 penalty is appropriate for each Defendant.

In addition, the Commission requests a penalty equal to three times the amount Mmobuosi gained

through his insider trades.

### 1. Corporate Defendants

The Commission requests that the Court impose a single, maximum Tier 3 penalty against

the Corporate Defendants separately in the amount of $1,152,314.00 each. A Tier 3 penalty is

appropriate given the egregiousness of the fraud and the high level of scienter involved. Each

Corporate Defendant over the course of several years fabricated non-existent revenues and assets to

make it appear that their core operating subsidiary was vastly more successful than it was and

generated an extensive paper trail of falsified books and records to conceal their fraud. TIH and Agri-Fintech exploited this fraud to extract vastly inflated sums from their respective sales of Tingo Mobile. And Agri-Fintech and Tingo Group intentionally deceived investors and shareholders by continuously filing false quarterly and annual reports with the Commission and issuing other public releases that reported knowingly and massively overstated financial results. Tingo Group continued the fraud even after the research analyst firm published its report in June 2023 exposing the scheme for the first time, and Tingo Group issued multiple, forceful, and false denials to prolong the scheme. Compl. ¶¶ 146–58. These frauds posed substantial risks of investor loss, which materialized when virtually the entire market capitalizations of Agri-Fintech and Tingo Group evaporated upon the fraud's revelation. Such pervasive and intentional misconduct weighs heavily in favor of a substantial penalty. [7]

The Commission requests the imposition of only one Tier 3 penalty against each of the Corporate Defendants as part of a single scheme, notwithstanding that the Court could, in its discretion and depending on its approach, calculate substantially more violations and impose a penalty many multiples higher. *See Reserve Fund Secs. & Deriv. Litig.*, 2013 WL 5432334, at *20 (noting that violations can be calculated based on the number of statutes violated, the number of transactions or misstatements, and/or the number of investors to whom the illegal conduct was directed). The Commission's request for this lower amount is in recognition of (i) the significant devaluation of these companies upon exposure of their fraud, and (ii) the significant disgorgement requested as to TIH and Agri-Fintech. A single Tier 3 penalty is also in line with the penalties awarded in comparable actions. *See, e.g.*, *SEC v. Gallison*, No. 15-cv-05456 (GBD) (SDA), 2023 WL

---

[7] Because the Defendants have not appeared, there is no demonstrated financial hardship that would justify a reduction to any of their proposed penalties.

8813637, at *2-3 (S.D.N.Y. Aug. 8, 2023) (single Tier 3 penalty against a corporation for violating the securities laws' anti-fraud and registration provisions); *SEC v. Carter*, No. 8:16-cv-02070 (JVS), 2023 WL 9197565, at *11-12 (C.D. Cal. July 14, 2023) (same); *SEC v. CKB168 Holdings, Ltd.*, No. 13-cv-5584 (HG), 2022 WL 3347253, at *7 (E.D.N.Y. Aug. 12, 2022) (same).

### 2. Mmobuosi

As to Mmobuosi, the Commission requests that the Court impose a Tier 3 penalty equivalent to his gross pecuniary gain from the fraud, as well as a penalty equivalent to three times the net profits from his illegal insider trades. This equates to $31,908,704.21 based on (i) the $25,494,589.79 he misappropriated from Tingo Group and (ii) three times his $2,138,038.14 net profits from insider trading ($6,414,114.42).

The Commission submits that the imposition of a penalty based on Mmobuosi's gross pecuniary gain is appropriate given the egregiousness and duration of his fraud, as well as his refusal to accept responsibility for his misconduct and demonstrated lack of remorse. As a fugitive in Nigeria (where he tried to evade service and remains at large in the parallel criminal action), he has issued a series of public denials to the press, while refusing to appear to defend against the allegations here. DiBattista Decl. ¶¶ 5–8, 28, Exs. 2–3, 19.

A penalty calculated by reference to Mmobuosi's gross pecuniary gain is also appropriate because the breadth of his scheme—involving violations of at least 15 separate statutory provisions through the pervasive falsification of books and records, the issuance of dozens of fraudulent misstatements and transactions directed at countless investors, and systematic auditor deception, and the evasion of internal accounting controls across multiple corporate entities for many years—would render calculating penalties on a per-violation basis infeasible, if not impossible. *See SEC v. Invest Better 2001*, No. 01 Civ. 11427(BSJ), 2005 WL 2385452, at * 5 (S.D.N.Y. May 4, 2005) (ordering penalties equal to the defendant's gross pecuniary gain because "[t]he exact number of violations

committed by the Defendants is nearly impossible to determine"); *see also SEC v. CMKM Diamonds, Inc.* 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009) (similar, and collecting similar cases).  The proposed penalty is also consistent with comparable penalties entered by district courts under similar circumstances.  *See, e.g.*, *SEC v. O'Brien*, 674 F. Supp. 3d 85, 104 (S.D.N.Y. 2023) (imposing $10,315,065.00 third-tier civil penalty, representing the primary fraudster's gross pecuniary gain from market manipulation scheme); *SEC v. Vuuzle Media Corp.*, No. 21-cv-1226 (KSH) (CLW), 2023 WL 4118438, at *11 (D.N.J. June 22, 2023) (imposing $25,807,490.73 third-tier civil penalty, representing the primary fraudster's gross pecuniary gain from offering fraud); DiBattista Decl. Ex. 15 (enclosing *SEC v. Barksdale*, No. 22-cv-1933 (LAK), ECF Dkt. No. 30 (S.D.N.Y. Mar. 15, 2023) (imposing $23,148,731 third-tier civil penalties against each of the two primary fraudsters behind fraudulent and unregistered crypto asset securities offerings, representing their net pecuniary gain)); *see also SEC v. Sanchez*, No. 21-cv-8085 (PKC), 2022 WL 1036792, at *3 (S.D.N.Y. Apr. 6, 2022) (imposing treble damages civil penalty on profits from insider trading based on, among other things, the defendant's high degree of scienter and failure to respond to the charges).

### D.    Mmobuosi Bar Orders.

Finally, for the reasons below, the Commission requests that the district court impose permanent officer and director and penny stock bars against Mmobuosi, as well as a conduct-based injunction prohibiting his participation in securities offerings or transactions.

#### 1.  Officer and Director Bar

Pursuant to Section 21(d)(2) of the Exchange Act, a district court can impose a bar permanently prohibiting an individual who has violated Section 10(b) of the Exchange Act from acting as an officer or director of any public company if the individual's conduct demonstrates unfitness to serve in such capacity.  *See* 15 U.S.C. § 78u(d)(2).  In assessing whether an individual is unfit to serve as an officer or director, courts may consider: "'(1) the egregiousness of the underlying

securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood the misconduct will recur.'" *SEC v. Bankosky*, 716 F.3d 45, 47 (2d Cir. 2013) (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)).

Based on these factors, Mmobuosi is patently unqualified to serve as an officer or director of a public company.  For at least five years, Mmobuosi orchestrated, and was the main beneficiary of, the elaborate fraudulent scheme described in the Complaint.  Mmobuosi's scheme infected three different U.S. companies—two of which are publicly-traded—and he was the CEO and primary shareholder of each company during the relevant period of the fraud.  Mmobuosi has failed to appear to respond to the Complaint (or the parallel criminal indictment), despite his publicly defiant stance in the press while a fugitive.  DiBattista Decl. ¶¶ 5–8, 28, Exs. 2–3, 19.  A permanent officer and director bar against Mmobuosi is therefore appropriate.

### 2. Penny Stock Bar

Section 21(d)(6) of the Exchange Act authorizes a district court to permanently prohibit an individual from participating in a penny stock offering if the individual was participating in such an offering at the time of the alleged misconduct.[8]  15 U.S.C. § 78u(d)(6).  The factors that courts generally consider in determining whether a penny stock bar is appropriate are the same as the facts considered for imposing an officer and director bar.  *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).  For the reasons already discussed with respect to the officer and director bar, a permanent penny stock bar is warranted against Mmobuosi.

---

[8] Agri-Fintech stock meets the definition of a penny stock under Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1] because it consistently traded over the counter for less than five dollars per share for over a year.  *See* Mele Decl. Ex. R.

### 3.   Permanent Injunction Against the Purchase, Sale or Issuance of Securities

The Commission also seeks an injunction permanently prohibiting Mmobuosi from participating in the issuance, purchase or sale—or engaging in activities for the purpose of inducing or attempting to induce the purchase or sale—of a security.  Exchange Act Sections 21(d)(1) and (5) [15 U.S.C. § 78u(d)(1), (5)] and Securities Act Section 20(b) [15 U.S.C. § 77t(b)] authorize a district court to grant any equitable relief appropriate or necessary to benefit investors.  This statutory authority permits the imposition of injunctions tailored to prohibit defendants from engaging in specific conduct that may harm investors.  *See, e.g.*, *SEC v. Gupta*, No. 11 Civ. 7566 (JSR), 2013 WL 3784138, at *3 (S.D.N.Y. July 17, 2013) (imposing conduct-based injunction under Section 21(d)(5) because it was appropriate and necessary to benefit investors).  District courts have invoked this authority to impose the type of injunctive relief requested.  *See, e.g.,* DiBattista Decl. Exs. 15–17 (enclosing *SEC v. Terraform Labs Pte Ltd.*, 23-cv-01346 (JSR), ECF Dkt. No. 273 at p.5 (S.D.N.Y. June 12, 2024) (entering final judgment imposing a similar prohibition with respect to crypto asset securities); enclosing *SEC v. Simmons*, 22-cv-07081 (JSR), ECF Dkt. No. 46 at p.3 (S.D.N.Y. June 28, 2023) (entering final judgment imposing a similar prohibition but carving out securities trading in the defendant's own personal account); enclosing *SEC v. Ten Cate*, 22-cv-2787 (PKC), ECF Dkt. No. 19 at p.3 (S.D.N.Y. Jan. 3, 2023) (same)).

The Commission submits that a prohibition on Mmobuosi's participation in, and any attempts to induce others to participate in, securities transactions is both appropriate and necessary for investor protection.  As discussed above with respect to the other requested permanent injunctive relief, Mmobuosi's scheme was brazen, longstanding, and committed with an intent to defraud investors in multiple U.S. companies for his own personal gain.  Mmobuosi exploited the U.S. financial system and abused his position as the CEO of a Nasdaq-listed and OTC-traded public company with abandon.  If not enjoined from participation in securities trading, issuances, and

24

offerings, he is likely to commit additional violations that undermine the integrity of the markets. Moreover, the only securities transactions in his own accounts that he ever executed were illegal insider trades of Agri-Fintech stock while in possession of material, nonpublic information. Thus, a carve-out of the requested injunction permitting Mmobuosi to trade securities in his own accounts is unwarranted and not appropriate, and it would risk additional harm to innocent investors.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that its application for default judgment against Defendants be granted.

Dated: New York, New York                SECURITIES AND EXCHANGE COMMISSION
      July 26, 2024

                                By:    /s/ David Zetlin-Jones
                                    David Zetlin-Jones
                                    Michael S. DiBattista
                                    New York Regional Office
                                    100 Pearl Street, Suite 20-100
                                    New York, NY 10004
                                    (212) 336-0978 (Zetlin-Jones)
                                    zetlinjonesj@sec.gov